UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X

COMFORT PINCKNEY,

         *Petitioner*,

     -*against*-

WILLIAM LEE, Superintendent of
Green Haven Correctional Facility,

         *Respondent*.

----------------------------------X

**MEMORANDUM & ORDER**

10-CV-01312 (KAM)

**KIYO A. MATSUMOTO, United States District Judge:**

       In 2010, petitioner Comfort Pinckney ("petitioner"),
proceeding *pro se,* filed this petition for a writ of *habeas
corpus* pursuant to 28 U.S.C. § 2254, challenging the
constitutionality of his 2003 state court conviction for Murder
in the Second Degree, Criminal Possession of a Weapon in the
Second Degree, and Criminal Possession of a Weapon in the Third
Degree.  (ECF No. 1, Petition for Writ of *Habeas Corpus* ("Pet.")
1.)  William Lee, the nominal respondent ("respondent"), opposes
the petition as procedurally barred and without merit.[1]  (*See* ECF
No. 9 (ECF pp. 17-74), Memorandum of Law in Opposition to
Petition ("Opp.").)

---

[1]    Mr. Lee was the Warden of Green Haven Correctional Facility,
petitioner's place of incarceration when this case commenced.  The District
Attorney of Queens County is representing respondent in this matter pursuant
to an agreement with the Attorney General of the State of New York.  (ECF No.
9 (ECF pp. 1-16), ADA Ushir Pandit Affidavit in Opposition ("Aff. in Opp.")
3.)  Petitioner filed his reply to respondent's opposition brief on February
9, 2011.  (ECF No. 20, Petitioner's Traverse to Return ("Reply").)

On March 6, 2013, the court entered an order staying proceedings in order to allow petitioner to exhaust his remedies in state court.  (Dkt. Order, dated March 6, 2013.)  This case has been stayed ever since, with only intermittent docket activity.  Petitioner's efforts to seek relief in state court remain pending.  (ECF No. 67, Status Update Letter, dated Feb. 19, 2020 ("Feb. 19 Ltr."); ECF No. 72, Status Update Letter, dated Oct. 19, 2020 ("Oct. 19 Ltr.").)  Nevertheless, as discussed below, this case is now ripe for adjudication of all claims asserted.  In addition, petitioner moved to amend his original petition on October 2, 2019.  (ECF No. 63, Motion to Amend Petition, dated Oct. 2, 2019 ("Mot. Amend").)  The court will address petitioner's Motion to Amend herein.  For the reasons discussed below, the petition is DISMISSED in its entirety, and petitioner's motion to amend his *habeas* petition is DENIED.

**BACKGROUND**

**A. The Shooting**

Petitioner was convicted for the murder of Michael Hammonds, who was shot in the face at point blank range.  On May 6, 2000, past midnight, Mr. Hammonds met up with his friends, Carmain Desir and Prague Alexander,[2] for a drink at Tony's Sports

---

[2]     On occasion, the record refers to Hammonds, Desir, and Alexander by their nicknames, Preme, Chronic, and Clifford, respectively.

Bar in Jamaica, Queens.  (Trial Tr. 296-97, 345.)[3]  Desir and

Hammonds went inside the bar, although Alexander did not.  (*Id.*

297-98.)  At around 2:00 or 2:30 am, Desir and Hammonds decided

to leave the bar to buy cigarettes at a nearby 24-hour bodega.

(*Id.* 297-99.)  As they were walking down a well-lit street,

toward the store, Desir observed petitioner and another male

"about to fight" across the street.  (*Id.* 300-01.)  In his trial

testimony, Desir vividly recalled petitioner's appearance that

night, specifically his "[l]ow caeser, low, low haircut," and

"green T shirt with a pocket on the left hand side and black

jeans[.]"  (*Id.* 302.)

        Once it became clear the petitioner's dispute with the

other male had deescalated, Desir and Hammonds turned around to

return to the bar.  (Trial Tr. 304-05.)  Petitioner, however,

turned his attention to Desir, expressing agitation that Desir

was looking in his direction.  (*Id.* 305.)  Petitioner approached

Desir in a belligerent posture, and the two nearly came to

blows.  (*Id.* 305-06.)  As petitioner and Desir came face-to-

face, Desir was able to closely observe the petitioner's

---

[3]     Citations to "Trial Tr." refer to the transcript of petitioner's
criminal trial proceedings in *People v. Pinckney*, Indictment No. 1497-2000,
in the New York Supreme Court, Queens County, from January 23 through
February 10, 2003. The 843-page trial transcript begins at ECF No. 68-1 (ECF
p. 109), and continues through ECF Nos. 68-2, 68-3, 68-4, 68-5, and 68-6.
Citations to the trial record correspond to the transcript, not ECF,
pagination.  The transcript for the *Wade* hearing proceedings on December 17,
2001 and May 22, 2002 (collectively, "*Wade* Hr'g Tr."), is available at ECF
No. 68-1, ECF pp. 24-40, 61-80, and citations likewise correspond to
transcript pagination.

appearance. (*Id.* 307-08.) Desir also paid close attention to petitioner's hand and arm movements, and noticed him take off a silver watch with a blue head. (*Id.* 309.) The two men exchanged heated words for several minutes, until Hammonds interceded, at which point Hammonds began to exchange words with petitioner. (*Id.* 311-14.)

Just as the confrontation seemed to wane, petitioner demanded that Desir and Hammonds "wait here." (*Id.* 315.) Petitioner walked to his "American made," "burgundy four-door car," parked down the block from the store. (*Id.* 315-16.) According to Desir, petitioner then opened the glove compartment, removed "something black with a handle" that he placed in his waist, and walked back towards Desir and Hammonds. (*Id.* 315, 317-18.) Petitioner and Hammonds resumed their argument, which lasted several more minutes, while petitioner adjusted the object in his waist. (*Id.* 318-20.) Desir was "right in their face" during the entirety of the exchange. (*Id.* 322.) Several parties also tried to intervene and lower the tension, to no avail. (*Id.* 322-23.)

Hammonds then asked petitioner "what the fuck" he was talking about. (Trial Tr. 324.) Petitioner stepped back, turned around, placed his hands on his waist, and pull out a black semiautomatic weapon. (*Id.* 324.) Desir was approximately three feet from petitioner at the time, but turned and fled the

moment petitioner pulled the weapon from his waist, before any
shots were fired. (*Id.* 324-26.)  As Desir fled, he heard shots
fired, and saw petitioner with his arm extended in a firing
motion, but did not actually see the weapon as it discharged.
(*Id.* 327-28.)  When Desir returned to the scene shortly after, a
crowd had gathered around, and he learned that Hammonds had been
shot. (*Id.* 329.)

      Prior to the shooting, Prague Alexander also
encountered petitioner outside the bodega, and approached him
under the assumption that it was another man, petitioner's
brother "Unique Pinckney." (Trial Tr. 447-48.)  When petitioner
turned around, Alexander realized that it was Unique Pinckney's
brother, petitioner. (*Id.*)  Alexander greeted him, and the two
spoke briefly. (*Id.* 451, 483.)  Alexander witnessed part of the
verbal altercation between Desir and petitioner, but knew little
of the situation. (*Id.* 452-58.)  Alexander decided to return to
the bar, but when he realized that Desir and Hammonds were not
following him, he turned around and began heading back to the
bodega. (*Id.* 457-58.)  As he approached the bodega, Alexander
witnessed the petitioner pull a gun out of his waistband, walk
up to Hammonds, and shoot him. (*Id.* 458-59.)  After Hammonds
fell to the ground, petitioner approached Alexander, stuck the
gun in his ribs, and asked him if he had seen anything. (*Id.*

461.)  Alexander said no, and the petitioner left.  Thereafter, Alexander called the police from a payphone.  (*Id.* 461-62.)

Garfield Smith was working as a bouncer at Tony's sports bar the night of the shooting. (Trial Tr. 495.)  After hearing a "pop," Smith left the bar to look outside.  (*Id.* 495-96.)  Smith looked down the block, and saw a milk truck that would come to the area every night around 2:00 a.m., and two black men walking away from a motionless body.  (*Id.* 497-98.)  The two men entered a red or maroon Ford Taurus, and drove away from the scene.  (*Id.* 498-500.)  After the car pulled away, Smith walked down the block to the area outside the bodega, where a crowd had gathered, and saw Hammonds' body laying on the ground.  (*Id.* 495-96.)  Smith recalled that Hammonds had been inside the bar earlier with a friend, and left after only a few minutes.  (*Id.*)

Smith returned to Tony's to secure the bar.  (Trial. Tr. 501.)  Shortly after, Smith saw a red Ford Taurus, which "looked very much []like" the car that had pulled away moments earlier, circle back to the scene.  (*Id.* 502-03.)  Although Smith looked down at the floor to avoid making eye contact with the vehicle's occupants, he managed to obtain the first part of the vehicle's license plate number: "T11."  (*Id.* 503-04.)  He also observed that there were no screws to hold down the bottom of the plate.  (*Id.* 504.)

6

Vincent Johnson was also present in the area around the time of the shooting.  Johnson was delivering milk to the bodega, unloading milk onto a handcart, when he heard a "pop." (Trial Tr. 415-418.)  When he turned around, he saw a man lying on the ground with blood "coming out of his eye."  (*Id.* 417-18, 435-36.)  Johnson turned away out of fear for his safety, and therefore, did not have a clear glimpse at the assailant's face. (*Id.* 418, 422.)  With his peripheral vision, however, Johnson saw the gunman put his arm around another person, threatening, in sum and substance, to shoot him if he spoke to the authorities.  (*Id.* 418, 422.)  He then observed the gunman walk to a "red or maroon," four-door Ford vehicle, and enter on the passenger side.  (*Id.* 423.)

Police and Emergency Medical Services personnel responded to the shooting, and arrived at the scene outside the bodega to find Hammonds lying on his back, with a gunshot wound to his face.  (Trial Tr. 236-38, 250-53, 424.)  Hammonds was taken to a local hospital, where doctors determined that he was brain dead.  (*Id.* 241, 411, 596.)  Hammonds died after his family decided to remove him from life support.  (*Id.*)

**B. The Investigation**

The police recovered a 9-millimeter bullet and a 9-millimeter shell casing from the crime scene, leading them to conclude that a 9-millimeter semi-automatic gun was the murder

7

weapon.  (Trial Tr. 279-80, 402-04.)  NYPD Detective John Moeser
was assigned to the case and focused on locating the red getaway
car, based on Smith's partial description.  (*Id.* 543-44.)  After
running the vehicle's make, model, color, and partial license
plate information through the Department of Motor Vehicles
database, Detective Moeser identified a red Ford Taurus with
license plate T116RC, registered to owner William Campbell.
(*Id.* 544-47.)  Detective Moeser arrived Mr. Campbell's Brooklyn
address at around 7:00 p.m. on May 6, 2000, and found Mr.
Campbell standing next to the vehicle.  (*Id.* 544-46.)  Detective
Moeser also learned that Mr. Campbell's wife was Shari Pinckney,
petitioner's sister.  (*Id.* 546-47.)  After conversing with Mr.
Campbell and Ms. Pinckney, Detective Moeser had the vehicle
towed back to the garage for the NYPD 105th Precinct.  (*Id.* 546-
48.)  Subsequently, Mr. Smith, the bouncer who reported a
partial license plate of the vehicle at the scene of the
shooting, was escorted by the police to the garage, and his
attention was directed to the impounded vehicle.  (*Id.* 504-05.)
After studying the vehicle, Mr. Smith confirmed that it was the
same car he had observed the gunman enter into and leave in.
(*Id.* 546-48.)

     The NYPD arrested petitioner on May 9, 2000, and
escorted him to the 105th Precinct to participate in a line-up
related to the investigation of Hammonds' shooting.  (Trial Tr.

8

561, 604.)  Once petitioner was in custody, Detective Moeser recovered a "large silver watch with a blue face" from petitioner's wrist.  (*Id.* 550.)  Desir subsequently identified petitioner from the line-up as Hammonds' killer.  (*Id.* 333).  Petitioner was thereafter indicted on two counts of Murder in the Second Degree, *see* New York Penal Law ("NYPL") §§ 125.25(1), (2), and Criminal Possession of a Weapon in the Second and Third Degree, *see* NYPL §§ 265.03(2), 265.02(4).  (Aff. in Opp. 4.)

### C. *Wade* Hearing

Petitioner moved to suppress testimony regarding the line-up identification.  Justice Hanophy denied petitioner's motion after conducting a *Wade* hearing on December 17, 2001 and May 22, 2002.[4]  (*Wade* Hr'g Tr. 1, 18.)  Detective Walter Panchyn testified that, on May 9, 2009, he showed Desir a photo array prepared by the Nassau County Police Department ("Nassau PD"), which contained petitioner's picture.  (*Id.* 3, 8.)  Sergeant Frank Libretto, who conducted the line-up at the police precinct, also testified that he afforded petitioner's attorney, Stephen Somerstein, Esq., the opportunity to modify and adjust the line-up prior to Desir's identification.  (*Id.* 25.)  Somerstein did, in fact, request that petitioner be permitted to

---

[4]      "A *Wade* hearing is held to determine if a witness's identification is tainted by unduly suggestive identification procedures." *Cardova v. Lavalley*, 123 F. Supp. 3d 387, 392 n.1 (E.D.N.Y. 2015) (citing *United States v. Wade*, 388 U.S. 218 (1967)).

change from a white tee-shirt to a black tee-shirt, and that the individuals in the line-up have their positions rearranged, which requests Sergeant Libretto granted. (*Id.* 25-27.) Somerstein also objected that the line-up fillers were heavier and older than petitioner. (*Id.* 35; *see also* Trial Tr. 606, 609, 616.)

**D. Trial**

At trial, the State presented the testimony of Carmain Desir and Prague Alexander. Defense counsel, Mr. Scott Brettschneider, Esq.,[5] moved to preclude Alexander's in-court confirmatory identification. (Trial Tr. 450.) Justice Joseph Rosenzweig, presiding, denied the motion to preclude, and preemptively denied any motion for mistrial based on that ruling. (*Id.*) Alexander identified petitioner as Mr. Hammonds' shooter, although Alexander initially believed it was petitioner's brother who was the assailant. (*Id.* 448.) Desir also identified petitioner as the shooter, and testified about the events that culminated in Hammonds' murder. Namely, Desir testified that petitioner pulled a gun from his waist and had earlier removed a silver watch with a blue face from his arm. (*Id.* 309, 323-24.) Detective Moeser also testified that he recovered a silver watch from petitioner's wrist following the

---

[5]     Prior to Mr. Brettschneider's representation, John Wallenstein, Esq. replaced Mr. Somerstein as petitioner's counsel. (ECF No. 71-1 (ECF p. 52), Attorney Affirmation of Stephen Somerstein, Esq., ¶ 2.)

arrest.  (*Id*. 550.)  Somerstein, petitioner's attorney at the
time of his arrest, confirmed at trial that the police recovered
a silver, blue-face watch from his former client's wrist.  (*Id*.
611-12.)

**E. Sentencing**

On February 10, 2003, a jury unanimously convicted
petitioner of Murder in the Second Degree, and Criminal
Possession of a Weapon in the Second and Third Degree.  (Trial
Tr. 839-43.)  One month later, petitioner successfully moved to
substitute Mr. Brettschneider as counsel.  (*See* ECF No. 68-1
(ECF pp. 87-90), Hearing for Reassignment of Counsel, dated
March 10, 2003.)   On March 28, 2003, Justice Rosenzweig denied
as meritless petitioner's *pro se* motion, pursuant to New York
Criminal Procedural Law ("CPL") section 330, to vacate his
conviction on the basis of ineffective assistance of counsel.
(*See* ECF No. 68-1 (ECF pp. 91-102), March 28, 2003 Hearing.)  On
July 2, 2003, Justice Rosenzweig denied petitioner's second
Section 330 motion, submitted by newly retained counsel Joseph
Defelice, Esq.  (ECF No. 68-1 (ECF pp. 54-57), Hearing on § 330
Motion, dated July 2, 2003.)  The second motion claimed that
defense counsel rendered ineffective assistance by failing to
file a notice of alibi witnesses, but the court found the claim
beyond the proper scope of a § 330 motion.  (*Id.*; Pet. 17.)

On July 29, 2003, Justice Rosenzweig sentenced petitioner to concurrent terms as follows: (1) 25 years to life imprisonment for Murder in the Second Degree; (2) five years' imprisonment for Criminal Possession of a Weapon in the Second Degree; and (3) three years' imprisonment for Criminal Possession of a Weapon in the Third Degree. (ECF No. 68-1 (ECF pp. 1-13), Sentencing Transcript dated July 29, 2003 ("Sent. Tr.") 11.)

**F. Post-Conviction Proceedings**

In January 2005, petitioner's appellate counsel, Lisa Napoli, Esq., filed a brief appealing Pinckney's conviction on the basis that the prosecutor's comments during summation denied petitioner a fair trial. (Defendant Comfort Pinckney's Appellate Brief, filed January 2005 ("App. Br.") 2.) On July 1, 2005, petitioner filed a *pro se* supplemental appellate brief, asserting: (1) the trial court abused its discretion by curtailing defense counsel's cross examination, allowing the prosecutor to enter into evidence the Nassau PD photo array without first establishing its authenticity, and because the trial testimony discredited the *Wade* hearing evidence; (2) the disparities inherent in the line-up tainted the identification procedure; (3) the prosecutor's failure to preserve three of four photographs of the line-up for appellate review required reversing petitioner's conviction; and (4) the trial court

erroneously denied defense counsel's motion to preclude a confirmatory identification. (*See generally Pro Se* Supplemental Appellate Brief, dated June 22, 2005 ("Supp. App. Br.").)[6]

On March 14, 2006, the Appellate Division, Second Department affirmed petitioner's judgment of conviction. *People v. Pinckney*, 27 A.D. 3d 581, 582 (N.Y. App Div. 2d Dep't 2006). The Appellate Division held, *inter alia*, that the line-up was not unduly suggestive, and that the State was not required to give notice for a confirmatory in-court witness identification. *Id.* On May 9, 2006, the New York Court of Appeals denied leave to appeal. *People v. Pinckney*, 6 N.Y.3d 897 (N.Y. 2006).

On May 29, 2007, petitioner filed a *pro se* motion to vacate judgment pursuant to CPL section 440.10. (Pet. 9.; ECF No. 71-1 (ECF pp. 9-35), § 440.10 Motion, filed May 29, 2007.) Petitioner moved on the following grounds:

> (1) Trial counsel was ineffective owing to a failure to conduct a pre-trial investigation, fail[ure] to interview and present alibi witnesses, fail[ure] to explore a valid line of defense, and fail[ure] to mount a challenge to the claim of probable cause for his arrest; (2) defendant's right to counsel was violated when he was arrested and interrogated, and when a photo array containing his photograph was shown to witnesses outside of his attorney's presence at a time when his attorney was representing him; (3) newly discovered evidence established that police testimony was fabricated as to where the police obtained his photograph that was in the photo array, and that the District Attorney's Office should have been aware of

---

[6]     Mr. Pinckney's Appellate Brief and *Pro Se* Supplemental Appellate Brief are not available on the electronic docket.  Respondent provided the court with hardcopy versions of these filings.  (*See* ECF No. 11.)

> the fabrication; and (4) trial counsel was also
> ineffective for failing to request DNA testing of a
> cap found at the crime scene, because such testing
> would have revealed exculpatory evidence.

(*Id.*)  On March 10, 2008, Robert L. Moore, Esq. filed a reply
brief and affirmation on petitioner's behalf, in support of his
*pro se* motion.  (ECF No. 71-1 (ECF pp. 70-76), Affirmation of
Robert L Moore, Esq., dated March 7, 2008; ECF No. 71-1 (ECF pp.
77-96), § 440.10 Reply.)  Justice Robert C. McGann denied
petitioner's motion to vacate on June 10, 2008 (*see* Pet. 15; ECF
No. 71-1 (ECF pp. 120-24), § 440.10 Order), and further denied
petitioner's application for reargument on March 24, 2009.
(Pet. 22; ECF No. 71-1, Order Denying Motion to Reargue.)  On
June 9, 2009, the Appellate Division, Second Department denied
petitioner's application for leave to appeal Justice McGann's
June 10, 2008 and March 24, 2009 orders.  (Pet. 23.; ECF No. 71-
1 (ECF p. 146), June 9 Order.)

On June 9, 2009, petitioner filed a *pro se* application
for a writ of error *coram nobis*.  (ECF No. 33-1, Writ of Error
*Coram Nobis*, dated June 9, 2009.)  Petitioner claimed his
appellate counsel, Ms. Napoli, rendered ineffective assistance
by not challenging, on appeal, the performance of petitioner's
trial counsel.  Petitioner specifically asserted that Ms. Napoli
should have (1) asserted error for counsel's failure to contest
Prague Alexander's confirmatory in-court identification, and (2)

challenged the legal sufficiency of the evidence presented to
the grand jury, especially after Desir supposedly admitted at
trial that he had testified falsely at the grand jury.  (*Id.*)
The Appellate Division denied defendant's *coram nobis*
application on November 24, 2009.  *People v. Pinckney*, 67 A.D.3d
1030 (N.Y. App. Div. 2d Dep't 2009).  On March 4, 2010, the New
York Court of Appeals denied petitioner leave to appeal.  *People
v. Pinckney*, 14 N.Y.2d 804 (N.Y. 2010).[7]

On March 12, 2018, petitioner filed a successive
motion to vacate pursuant to CPL § 440.10 with the Queens County
Supreme Court.  (ECF No. 54, Petitioner's Status Update Letter,
dated Dec. 10, 2018.)  In his successive § 440.10 motion,
petitioner asserted that the prosecution violated his rights
under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United
States*, 405 U.S. 150 (1972) by:

> 1) failing to disclose information, at the Wade
> hearing, harmful to the credibility of detective
> Walter Panchyn, who testified falsely that Carm[a]in
> Desir identified [petitioner] from a photo array on
> May 9, 2000, leading to my arrest and line-up
> identification, 2) misrepresenting during trial, in
> response to defense counsel's objection to Prague
> Alexander's surprise in-court identification of me as

---

[7]     On March 17, 2015, the Appellate Division determined that petitioner's
application for leave to appeal the lower court's denial of his application
for DNA testing pursuant to CPL § 440.30(1-a) was unnecessary because an
order denying DNA testing is appealable as of right.  (ECF No. 43,
Government's Status Update Letter, dated Oct. 14, 2015.)  On April 9, 2015,
petitioner filed a brief with the Appellate Division appealing the lower
court's denial of his request for DNA testing pursuant to CPL § 440.30(1-a).
(ECF No. 60, Petitioner's Status Update, dated April 10, 2019.)  To the
court's knowledge, this appeal remains pending.

> of May 6, 2000, and 3) committing fraud upon the court
> pertaining to the photographic identification
> procedure.

(*See* Mot. Amend. 1.) "In sum, [petitioner] argued the allege[d]

May 6th and May 9th identification procedures could not have

possibly occurred because the police did not posses my Learner's

Permit photograph until May 10--the date the photograph bears

upon being retrieved from the DMV's computer database." (*Id.*

2.) As relief, petitioner sought an evidentiary hearing

pursuant to CPL § 440.30(6), in order to resolve "factual

disputes" regarding the "date when the DMV . . . issued the

certificate bearing [petitioner's] Learner's permit photograph."

(*Id.*) On February 2, 2019, the Supreme Court, Queens County

denied petitioner's successive § 440.10 motion in its entirety,

including his request for an evidentiary hearing ("February 2019

Order"). (ECF No. 57, Government's Status Update Letter, dated

April 5, 2019.) The Appellate Division and Court of Appeals

subsequently denied petitioner leave to appeal the lower court's

denial. (*Id.*)

### G. The *Habeas* Petition

On March 22, 2010, petitioner filed the instant *habeas*

petition in the Eastern District of New York. (*See* Pet. 1.)

Petitioner asserts: (1) ineffective assistance of trial counsel;

(2) denial of due process based on the lower court finding that

trial counsel's affidavit held greater probative value than the

16

certified trial transcript; (3) denial of due process and the right to a fair trial due to "unduly suggestive" police identification procedures; and (4) ineffective assistance of appellate counsel. (*See generally* Pet.)

Further, the respondent construes the petition as implicitly asserting a claim of "newly discovered evidence." (Opp. 41.) Petitioner's reply confirms the respondent's construction. (Reply 13-17.) In short, petitioner asserts he obtained evidence, back in 2006, that Detective Panchyn lied about the source of the photo array at the *Wade* Hearing, and that this falsehood infringed petitioner's due process rights by harming "the integrity of the normal process of adjudication." (Reply 15.) In addition, petitioner's October 2, 2019 Motion to Amend seeks the evidentiary hearing denied by the February 2019 Order, to resolve the factual disputes raised in his successive § 440.10 motion filed in 2018. (*See generally* Mot. Amend.)

On March 6, 2013, this court granted petitioner's request for a stay of proceedings in order to allow him to exhaust his administrative remedies. (Dkt. Order, dated March 6, 2013.) Petitioner's further stay requests were also granted (*see* ECF Nos. 23, 25), and the stay has been in place since, with the last extension being ordered on December 3, 2019. The court now exercises its discretion to lift the stay, and will resolve petitioner's *habeas* claims and his motion to amend.

## STANDARD OF REVIEW

Pursuant to Section 2254 of the Antiterrorism and
Effective Death Penalty Act ("AEDPA"), a district court shall
issue a writ of *habeas corpus* for an individual in state custody
"only on the ground that he is in custody in violation of the
Constitution or law or treaties of the United States." 28
U.S.C. § 2254(a). A district court may grant a writ of *habeas
corpus* for claims that were adjudicated on the merits in state
court and if the adjudication (1) "resulted in a decision that
was contrary to, or involved an unreasonable application of,
clearly established Federal law, as determined by the Supreme
Court of the United States"; or (2) "resulted in a decision that
was based on an unreasonable determination of the facts in light
of evidence presented in the State court proceeding." 28 U.S.C.
§ 2254(d). "A state court adjudicate[s] a state prisoner's
federal claim on the merits when it (1) disposes of the claim
'on the merits,' and (2) reduces its disposition to judgment."
*Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001) (brackets in
original) (citing 28 U.S.C. § 2254(d)(1)); *see also Chandler v.
Girdich*, No. 04-CV-432(JTE)(VEB), 2007 WL 1521128, at *3
(W.D.N.Y. Apr. 25, 2007) (citing 28 U.S.C. § 2254(d)(1),(2)).

Dismissal of a *habeas* claim on the ground that the
claim was procedurally defaulted is a disposition of the claim
on the merits. *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir.

2001).  "The United States Supreme Court has held that reliance by a state court upon an adequate and independent state ground to decide[] a constitutional claim precludes federal habeas review of that claim unless the petitioner can show cause for the default and prejudice attributable thereto, or that the petitioner is factually innocent such that a fundamental miscarriage of justice would occur should the federal court decline to hear the claim." *Mills v. Girdich*, 614 F. Supp. 2d 365, 379 (W.D.N.Y. May 15, 2009) (citing *Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991)).  "This procedural default doctrine and its attendant 'cause and prejudice' standard are grounded in concerns for federalism and comity between the state and federal sovereigns." *Aparicio*, 269 F.3d at 90 (quoting *Coleman*, 501 U.S. at 730).

A petitioner may fulfill the cause requirement by demonstrating that "some objective factor, external to Petitioner's defense, interfered with his ability to comply with the state's procedural rule." *Gutierrez v. Smith*, 702 F.3d 103, 111 (2d Cir. 2012) (citing *McClesky v. Zant*, 499 U.S. 467, 493 (1991)).  The petitioner can also establish cause by demonstrating that "prior state case law has consistently rejected a particular constitutional claim." *Id.* (citing *DiSimone v. Phillips*, 461 F.3d 181, 191 (2d Cir. 2006)).  In order to establish prejudice, petitioner must demonstrate that

the alleged error resulted in "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Torres v. Senkowski*, 316 F.3d 147, 152 (2d Cir. 2003) (internal quotation marks and citation omitted).

The procedural default may also be excused if the petitioner can show that a fundamental miscarriage occurred, where "in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Osbourne v. Heath*, No. 12-CV-1138 JFB, 2015 WL 1548947, at *8 (E.D.N.Y. Apr. 8, 2015) (citing *House v. Bell*, 547 U.S. 518, 537 (2006)). "A miscarriage of justice is demonstrated only in extraordinary cases, such as where a constitutional violation results in the conviction of an individual who is actually innocent." *McCall v. Capra*, 102 F. Supp. 3d 427, 446 (E.D.N.Y. 2015) (citing *Osbourne*, 2015 WL 1548947, at *8); *see also Bousley v. United States*, 523 U.S. 614, 623-24 (1998) ("Actual innocence means factual innocence, not mere legal insufficiency.").

In reviewing the instant petition, the court is mindful that "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)

20

(internal quotation marks and citations omitted); *see also*
*Williams v. Kullman*, 722 F.2d 1048, 1050 (2d Cir. 1983) ("due to
the *pro se* petitioner's general lack of expertise, courts should
review habeas petitions with a lenient eye . . . ."").
Therefore, the court interprets petitioner's pleadings as
raising the strongest arguments they suggest. *Harris v. Mills*,
572 F.3d 66, 72 (2d Cir. 2009); *see also Martin v. United*
*States*, 834 F. Supp. 2d 115, 119 (E.D.N.Y. 2011) (citing
*Williams*, 722 F.2d at 1050).

## DISCUSSION

### I.   Motion to Amend

Petitioner moves to amend "Ground Two" of the petition
on the basis that the state court denied his successive § 440.10
motion without an evidentiary hearing.  (*See* Mot. Amend. 1.)
Petitioner argues that the state court erred in denying his
request for an evidentiary hearing pursuant to CPL § 440.30(6),[8]
and by leaving unresolved the date on which the DMV provided
"any law enforcement agency" with petitioner's Learner's Permit
photograph.  (*Id.* 2.)  He now seeks the evidentiary hearing
denied him in state court.  (*Id.*)

A petitioner's motion to amend is governed under
Federal Rule of Civil Procedure 15(a).  *See* Fed. R. Civ. P.

---

[8]     CPL § 440.30(6) states that "the defendant has the burden of proving by
a preponderance of the evidence every fact essential to support the motion"
at an evidentiary hearing pursuant to subsection 440.30(5).

15(a).  Where, as here,, a responsive pleading has been served, the court grants leave to amend "when justice so requires." *Id.* 15(a)(2).  Although "leave to amend generally should be freely granted, it may be denied where there is good reason to do so, such as undue delay, bad faith, dilatory tactics, undue prejudice to the party to be served with the proposed pleading, or futility." *Edwards v. Fischer*, No. 01Civ.9397(LAK)(THK), 2002 WL 31833237, at *1 (S.D.N.Y. Dec. 16, 2002) (citing *Forman v. Davis*, 371 U.S. 178, 182 (1962)).  A proposed amendment is futile "if the proposed claim could not withstand a motion to dismiss for failure to state a claim upon which relief may be granted." *Id.* (quoting *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002)).  "[I]t is well established that leave to amend a complaint need not be granted when amendment would be futile." *Ellis v. Chao*, 336 F.3d 114, 126 (2d Cir. 2003) (citing *Forman*, 371 U.S. at 182).

The Second Circuit has held that alleged errors in a post-conviction proceeding are not grounds for Section 2254 review because "federal law does not require states to provide a post-conviction mechanism for seeking relief." *Word v. Lord*, 648 F.3d 129, 132 (2d Cir. 2011); *cf. Lackawanna Cty. Dist. Att'y v. Coss*, 532 U.S. 394, 402 (2001) ("[E]ach State has created mechanisms for both direct appeal and state postconviction review . . ., even though there is no

22

constitutional mandate that they do so.") (citing *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987)).  Petitioner seeks to amend the petition to challenge the state court's denial of an evidentiary hearing in his § 440.10 proceeding as contrary to CPL § 440.10(6).  His proposed amendment does not, however, challenge "the judgment which provides the basis for his incarceration." *Antoine v. Ercole*, No. 11-CV-00088 (PKC), 2013 WL 4647497, at *17 (E.D.N.Y. Aug. 29, 2013) (quoting *Jones v. Duncan*, 162 F. Supp. 2d 204, 218 n.21 (S.D.N.Y. 2001)).  Accordingly, petitioner's Motion to Amend does not state a cognizable *habeas* claim.  *Id.; see also Hall v. Griener*, No. 00Civ.5517(EHP)(HBP), 2004 WL 350759, at *2 (S.D.N.Y. Feb. 24, 2004) ("[A] violation of state law provides no basis for habeas relief.").  Petitioner's Motion to Amend is therefore denied as futile.

## II.  Ground One: Ineffective Assistance of Trial Counsel

Petitioner asserts his trial counsel committed a litany of errors, violating his Sixth Amendment right to effective counsel.  (§ 440.10 Motion 3.)  The petition does not allege ineffective assistance of counsel so much as it appends portions of petitioner's § 440.10 Motion regarding defense

counsel's on- and off-the-record actions and omissions.[9]  (Pet. 9.)

With respect to claims that petitioner raised in his § 440.10 proceeding, petitioner asserts his Sixth Amendment right to effective assistance of counsel was violated because his trial counsel: (1) failed to conduct a pre-trial investigation; (2) failed to interview and present alibi witnesses; (3) failed to explore a valid line of defense; (4) failed to mount a challenge to the claim of probable cause for his arrest; and (5) failed to request DNA testing that would lead to alleged exculpatory evidence.  (*Id.* 8-9.)

## A. Petitioner's Claim is Not Procedurally Barred

Respondent urges the court to dismiss petitioner's claim of ineffective assistance of trial counsel as procedurally barred.  (Opp. 16.)  In the § 440.10 Order, Justice McGann denied petitioner's ineffective assistance of counsel claims both on the merits and as procedurally barred under CPL § 440.10(2)(c).[10],[11]  (§ 440.10 Order 3; *see also* Pet. 17-22.)  The

---

[9]    Construing the petition in the most liberal manner, the court proceeds to consider petitioner's allegations of ineffective assistance of counsel in his § 440.10 Motion as though they were realleged herein.

[10]    Justice Robert C. McGann's March 24, 2009 Memorandum denied petitioner's motion to reargue.  (Pet. 21; Order Denying Motion to Reargue.)

[11]    The text of CPL § 440.10(2)(c) provides that a trial court:

[M]ust deny a motion to vacate a judgment when, [a]lthough sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or

Appellate Division denied petitioner leave to appeal the §

440.10 Order.  (Pet. 23; June 9 Order.)

The Second Circuit has stated that a state court's

reliance on CPL § 440.10(2)(c) to deny an ineffective assistance

of counsel claim, based on petitioner's failure to raise the

claim on direct appeal, is an independent and adequate state law

ground that precludes federal *habeas* review.  *See Reyes v.

Keane*, 118 F.3d 136, 140 (2d Cir. 1997).  Further, a motion

pursuant to CPL § 440.10 "cannot be used as a vehicle for an

additional appeal or as a substitute for a direct appeal."

*Jones v. Miller*, No. 03CIV.6993SHSGWG, 2004 WL 1416589, at *9

(S.D.N.Y. June 25, 2004) (quoting *People v. Donovon*, 107 A.D.3d

433 (N.Y. App. Div. 2d Dep't 1985)).

In the present case, however, "some of the

[petitioner]'s allegations of ineffectiveness involve matters

appearing on the record, while other involve matters that are

outside the record," meaning petitioner "has presented a 'mixed

claim' of ineffective assistance."  *Pierotti v. Walsh*, 834 F.3d

171, 178 (2d Cir. 2016) (quoting *People v. Maxwell*, 89 A.D.3d

1108, 1109 (N.Y. App. Div. 2d Dep't 2011) (alteration omitted)).

"Where a defendant presents a mixed claim of ineffective

---

determination occurred owing to the defendant's unjustifiable failure
to take or perfect an appeal during the prescribed period or to his
unjustifiable failure to raise such ground or issue upon an appeal
actually perfected by him.

CPL § 440.10(2)(c).

assistance . . . such a mixed claim, presented in a Section
440.10 motion, is not procedurally barred, and the Section
440.10 proceeding is the appropriate forum for reviewing the
claim of ineffectiveness in its entirety." *Id.* (quoting
*Maxwell*, 89 A.D.3d at 1109) (alteration in original, brackets,
and internal quotation marks omitted).

The court finds that CPL § 440.10(2)(c) does not erect
a procedural bar to petitioner's claims, and, therefore does not
establish grounds for procedural default because a *habeas*
petitioner may successfully challenge a procedural bar, even a
"firmly established and regularly followed" one, such as CPL §
440.10(2)(c), where the state court's application of the rule
was "exorbitant," thus rendering the state ground "inadequate to
stop consideration of a federal question." *Pierotti*, 834 F.3d
at 177 (quoting *Lee v. Kemna*, 534 U.S. 362, 376 (2002)).
Petitioner's § 440.10 Motion raised a unified ineffective
assistance of counsel claim that depended partly on facts
appearing in the trial record, as well as facts outside the
record. Therefore, petitioner's "claim is not procedurally
barred, and the court must review it on the merits." *Hernandez
v. Artus*, 09-CV-05694 (KAM), 2020 WL 2769404, at *7 (E.D.N.Y.
May 28, 2020) (citing *Anderson v. Lee*, No. 19-CV-4488 (BMC),
2020 WL 1682605, at *7 (E.D.N.Y. Apr. 7, 2020)).

26

**B. Legal Standard**

A petitioner must meet the "highly demanding" standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), to prevail on a claim of ineffective assistance of counsel. *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986).  The reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and "[j]udicial scrutiny of counsel's performance must be highly deferential."  *Strickland*, 466 U.S. at 689. Under the two-prong *Strickland* test, a *habeas* petitioner must demonstrate (1) that "counsel's representation fell below an objective standard of reasonableness," (the performance prong) and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (the prejudice prong).  *Strickland*, 466 U.S. at 688, 703; *see also Parker v. Ercole*, 666 F.3d 830, 834 (2d Cir. 2012) (court need not address both prongs if a petitioner makes an insufficient showing on one).  The petitioner bears the burden of establishing both that his counsel was deficient and that he was prejudiced.  *See United States v. Birkin*, 366 F.3d 95, 100 (2d Cir. 2004) (citing *Strickland*, 466 U.S. at 687).

To establish that counsel's performance was deficient under the first prong, petitioner must show that counsel's

representation "fell below an objective standard of
reasonableness." *Strickland*, 466 U.S. at 688.  A court
reviewing an attorney's performance must be "highly
deferential," making "every effort . . . to eliminate the
distorting effects of hindsight" and evaluating "the conduct
from counsel's perspective at the time." *Id.* at 689.
Consequently, a reviewing court "must indulge a strong
presumption that counsel's conduct falls within the wide range
of reasonable professional assistance[.]" *Id.; accord Brown v.
Greene*, 577 F.3d 107, 110 (2d Cir. 2009).

     To satisfy the second prong—prejudice—a *habeas*
petitioner must show "a reasonable probability that, but for
counsel's unprofessional errors, the result of the proceeding
would have been different.  A reasonable probability is a
probability sufficient to undermine confidence in the outcome."
*Strickland*, 466 U.S. at 694.  Merely alleging that errors "had
some conceivable effect on the outcome of the proceeding" is
insufficient.  *Id.* at 693.  Instead, "[c]ounsel's errors must be
'so serious as to deprive the defendant of a fair trial, a trial
whose result is reliable.'" *Harrington v. Richter*, 562 U.S. 86,
104 (2011) (quoting *Strickland*, 466 U.S. at 687).  "In assessing
prejudice stemming from the failure to investigate and introduce
certain evidence, a court must consider '*all* the relevant
evidence that the jury would have had before it,' had the

28

evidence been introduced, including unfavorable evidence."
*Barnes v. Burge*, 372 F. App'x 196, 199 (2d Cir. 2011) (emphasis
in original) (quoting *Wong v. Belmontes*, 558 U.S. 15, 20 (2009)
(per curiam)).

Further, a *habeas* petitioner's ineffective assistance
claim "must overcome a separate hurdle" where a state court has
already specifically determined that counsel's performance was
not ineffective under *Strickland*. *Bonds v. Keyser*, No. 16-CV-
05908 (AMD), 2020 WL 1550575, at *14 (E.D.N.Y. Mar. 31, 2020).
Here, the state court rejected petitioner's ineffective
assistance claims on both procedural grounds, and the merits.
Thus, under the AEDPA's "'unreasonable application' clause, a
federal habeas court may not issue the writ simply because that
court concludes in its independent judgement that the state-
court decision applied *Strickland* incorrectly." *Woodford v.
Visciotti*, 537 U.S. 19, 24 (2002) (citing *Bell v. Cone*, 535 U.S.
685, 698-699 (2002)). Instead, it is the *habeas* petitioner's
"burden to show that the state court applied *Strickland* to the
facts in an objectively unreasonable manner," which is
altogether distinct from showing the state court applied federal
law incorrectly. *Id.* (citing *Williams* v. *Taylor*, 529 U.S. 362,
410 (2000)). Because the standards created by *Strickland* and
the AEDPA are both highly deferential, "when the two apply in
tandem, review is 'doubly' [deferential]." *Harrington*, 562 U.S.

29

at 105 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).  "[T]he question is not whether counsel's actions were reasonable," but rather "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id*.  Even if the state court does not explain its decision, the petitioner still bears the burden of showing that "there was no reasonable basis for the state court to deny relief."  *Jean v. Greene*, 523 F. App'x 744, 747 (2d Cir. 2013) (quoting *Harrington*, 562 U.S. at 99).

Accordingly, petitioner must demonstrate that the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Bonds*, 2020 WL 1550575, at *14 (citing *Harrington*, 562 U.S. at 102-03).

**C. Petitioner's Ineffective Assistance Claims Fail**

1. Failure to Conduct a Pre-trial Investigation

Petitioner asserts that "[i]f defense counsel had made a prior investigation – prior to trial – or if he had paid sufficient attention to the police reports that were turned over to him . . . he would have been able to deal significant blows to the prosecution's case in several ways."  (§ 440.10 Motion 5-6.)  According to petitioner, his pre-trial counsel, Mr. Brettschneider, failed to visit the scene of the shooting, thereby depriving petitioner "of valuable evidence that would

30

have brought the police investigation into question in the minds of the jury." (*Id.* 6.)  Petitioner maintains that had his counsel visited the crime scene, he could have challenged the police narrative regarding the direction of the shooting and the identification of petitioner as the shooter.  (*Id.* 6-7.)  For instance, petitioner suggests that diligent counsel would have seized on the proximity of the spent shell casing and discharged projectile found near Mr. Hammonds' body, and cast doubt on whether the projectile was the actual discharge that killed Hammonds.  (*Id.* 6.)  Petitioner does not elaborate exactly how counsel would have, or could have, used this information to advance petitioner's defense.  Petitioner also notes an apparent evidentiary conflict between witness accounts that Hammonds was standing with his back to certain nearby store-fronts when the shooter discharged the gun in his face, and the otherwise intact windows and lack of blood spatter on the same store-fronts.[12] (*Id.* 7.)  Yet again, however, petitioner does not explain how these facts, if credited, are mutually exclusive.

The state court's denial of petitioner's ineffective assistance claim on this basis was neither contrary to, nor an unreasonable application of *Strickland*.  Petitioner fails to

---

[12]   Within this argument, petitioner also asserts that Brettschneider failed to request DNA from a bloodied baseball cap found at the scene of Hammonds' murder.  (§ 440.10 Motion 8.)  Petitioner reiterated the same argument elsewhere in his motion to vacate, and it is dealt with below.

demonstrate how an investigation of the crime scene by counsel
would have changed the outcome of his trial.  The record makes
clear that the prosecution's case relied principally on
eyewitness identifications of petitioner as the shooter,
specifically Desir and Alexander's, as well as Detective Moeser
and Garfield Smith's testimony connecting the getaway vehicle
spotted at the crime scene to petitioner.  There is no
indication the prosecution relied on the location of the shell
casings, the bullets, or the victim's body to advance its case.
Nor does petitioner explain how any crime scene evidence was not
otherwise available to defense counsel, who had access to the
same photographs and reports that were available to, and
utilized by, the prosecution at trial.  In addition, petitioner
was arrested only three days after the shooting, and it appears
unlikely that the bullets and shell casings would have remained
at the crime scene for that entire period, and not secured into
evidence by the police.

        Although defense counsel had a "duty to make a
reasonable investigation," or else reasonably determine that
such an investigation was unnecessary, *Wiggins v. Smith*, 539
U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 690), that
duty was not breached here.  Petitioner incredulously suggests
that a diligent attorney would have used a pre-trial
investigation of the crime scene to advance petitioner's

32

defense.  Based on little more than his own *ipse dixit*,
petitioner asserts that the bullet's location near Hammonds'
body renders the police's theory improbable, and suggests that
the police and prosecutors manufactured an exit wound to support
their theory and overcome the purported incongruity between
immediate medical reports finding no exit wound, and the medical
examiner's report. (§ 440.10 Motion 7.)  Given the utter lack of
evidentiary support for petitioner's contentions, both in the §
440.10 proceeding and now, Mr. Brettschneider had no duty to
embark on such a patently unreasonable investigation.  *Rosario
v. Ercole*, 601 F.3d 118, 130 (2d Cir. 2010) (emphasis added);
*see also Vasquez v. United States*, No. 91 CR. 153 (PKL), 1997 WL
148812, at *1-2 (S.D.N.Y. Mar. 28, 1997) ("Petitioner's
allegations with regard to alleged counsel errors in pre-trial
preparation and investigation and trial advocacy are vague,
conclusory, and unsupported by citation to the record, any
affidavit, or any other source, and, accordingly, the vague and
unsubstantiated nature of the claims defeated petitioner's claim
of ineffective assistance of counsel.") (brackets, internal
quotation marks, and ellipses omitted).

    In any event, Mr. Brettschneider affirms he did
"visit[] the location of the incident with investigator Kevin
Hinkson," and at counsel's direction, "Mr. Hinkson took
photographs of the scene."  (Affirmation of Scott

33

Brettschneider, Esq. ("Brettschneider Aff.") ¶ 6.)[13]  Mr.
Brettschneider further states that he "introduced a videotape
depicting the vantage point – the distance and lighting
conditions – of the People's witnesses to the murder and the
murderer." (*Id*. ¶ 11.)  Petitioner's blanket assertion that Mr.
Brettschneider failed to conduct a pre-trial investigation is,
ultimately, "offered without detail or supporting
documentation," and such attacks on counsel's performance "have
been found inadequate to support a claim of ineffective
assistance in the face of a credible and contradictory affidavit
by counsel." *United States v. Rosario*, No. 13 CR 514 NRB, 2015
WL 4629453, at *6 (S.D.N.Y. Aug. 4, 2015).

Accordingly, petitioner fails to show that Mr.
Brettschneider rendered ineffective assistance by failing to
conduct a pre-trial investigation and, moreover, fails to show

---

[13]    Mr. Brettschneider's affirmation is not available on the electronic
docket, but was provided to the court in hardcopy.  Further, on October 16,
2020, the Second Circuit Court of Appeals affirmed Ms. Brettschneider's
conviction for conspiracy and making false statements. *United States v.
Brettschneider*, No. 19-2423-CR, 2020 WL 6112275 (2d Cir. Oct. 16, 2020).
Specifically, the government claimed that Mr. Brettschneider conspired with
one of his legal assistants to lie in a letter to the Bureau of Prisons in an
effort to secure a position for one of Mr. Brettschneider's clients in a
Residential Drug Abuse Program, even though the client did not have a recent
history of drug or alcohol abuse. *Id*.  Mr. Brettschneider's conviction does
not impact the court's analysis.  First, petitioner's arguments fail for
reasons independent of Mr. Brettschneider's representations, namely
petitioner's failure to submit sworn testimony and the implausibility of
petitioner's arguments.  Second, the court's findings in this Memorandum and
Order do not rely solely, or even principally, on Mr. Brettschneider's
credibility.  Third, there is no indication that Mr. Brettschneider's
criminal conduct impacted his representation of petitioner at trial, much
less rendered it inadequate.  Mr. Brettschneider committed the subject
offenses in 2014 and 2015, well over a decade after he represented petitioner
at trial.

that Justice McGann's rejection of petitioner's claim on this
basis was contrary to, or an unreasonable application of
*Strickland*.

    2. <u>Failure to Interview and Present Alibi Witnesses</u>

    Next, petitioner attacks Mr. Brettschneider's failure
to present purported alibi witnesses at trial.  According to
petitioner, Mr. Brettschneider failed "to at least interview
those witnesses and weigh the value and credibility of their
proposed testimony."  (§ 440.10 Motion 9.)

    "The decision whether to call any witnesses on behalf
of the defendant, and if so which witnesses to call, is a
tactical decision of the sort engaged in by defense attorneys in
almost every trial."  *Logan v. Ercole*, No. 08 CV 407 (JG), 2008
WL 2097439, at *7 (E.D.N.Y. May 20, 2008) (quoting *United States
v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987)).  "Such
decisions 'fall squarely within the ambit of trial strategy, . .
. and if reasonably made, will not constitute a basis for an
ineffective assistance claim.'" *Id*. (quoting *Nersesian*, 824 F.2d
at 1321).  On the other hand, a defense attorney's failure to
contact witnesses as part of an alibi defense may render
counsel's performance deficient.  *See Lopez v. Miller*, 915 F.
Supp. 2d 373, 420-21 (E.D.N.Y. 2013) (collecting cases); *see
also Pavel v. Hollins*, 261 F.3d 210, 220 (2d Cir. 2001) ("[A]n
attorney's failure to present available exculpatory evidence is

ordinarily deficient, unless some cogent tactical or other consideration justified it."); *but see Headley v. Ercole*, No. 9:07-CV-979 FJS/GHL, 2010 WL 3808685, at *8 (N.D.N.Y. Sept. 22, 2010) ("The decision to refrain from calling a specific witness, even one who may offer exculpatory evidence, is ordinarily not viewed as a lapse in professional representation.") (citation omitted).  But that is not the case here.

Petitioner's purported alibi defense rests upon flimsy documentation, which is wholly insufficient to substantiate his contention.  Petitioner presented the following documents in state court: (1) affidavits from the two alleged alibi witnesses, Donte McAllister (ECF No. 71-1 (ECF p. 59), McAllister Aff.) and Brian Follins (ECF No. 71-1 (ECF p. 60), Follins Aff.); (2) an affidavit from investigator Kevin Hinkson (ECF No. 71-1 (ECF p. 61), Hinkson Aff.), who was hired by petitioner's mother; (3) an affidavit from petitioner's mother, Sonia Pinckney (ECF No. 71-1 (ECF p. 53), Pinckney Aff.); and (4) an affidavit from petitioner's attorney at the time of arrest, Mr. Somerstein (ECF No. 71-1 (ECF p. 52), Somerstein Aff.).[14]  (*See generally* § 440.10 Motion, Affidavits in Support.) Not one of the aforementioned documents reasonably suggests that

_____

[14]    In addition, Mr. Defelice, the court-appointed attorney who represented petitioner in connection with his § 330 Motion, provided an affirmation summarizing the supporting affidavits.  (ECF No. 71-1 (ECF pp. 49-51), Defelice Aff.)  Mr. Defelice's affirmation, filed in support of petitioner's 2003 § 330 Motion, appears to have been reproduced in support of petitioner's § 440.10 Motion as well.

petitioner's trial counsel failed to interview and/or present a *viable* or *credible* alibi witness.

      First and foremost, the McAllister and Follins affidavits are bereft of details and lack indicia of reliability.  Even a surface-level review of the affidavits immediately triggers doubts about their credibility: the affidavits are verbatim replicas of one another, save for substitution of the affiants' names.[15]  Each affidavit reads exactly as follows, with the lone exception of the affiant's name:

> I would have, if called upon, went to court and testified on behalf of Comfort Pinckney at trial, Indictment #1497/2000. Mr. Pinckney's trial attorney never contacted me, nor interviewed me concerning this incident.
>
> Mr. Pinckney is not the person who committed the crime of murder pending against him.  Furthermore, Mr. Pinckney was not in Queens on the date and time of this incident.  I spoke to a Private Investigator, Kevin Hinkson who was working on Mr. Pinckney's case and informed him that a friend and I drove Mr. Pinckney to Brooklyn that night. Therefore, he could not have committed the crime of murder of which he was accused.
>
> When called upon, I went to court and spoke to Mr. Pinckney's attorney – Mr. Joseph Defelice, however, I

---

[15]    Respondent surmises that petitioner has tailored the affidavits so that the affiants could swear to them without the threat of perjury liability. (Opp. 34-35.)  For example, both affiants state that they drove petitioner to Brooklyn "on the date and time of the incident," but this phrasing gives the affiants wiggle room to assert that their sworn statement refers to a time other than the early morning hours of May 6, 2000.  The respondent's theory seems plausible, to say the least, but the court has relied on other factors in rejecting petitioner's ineffective assistance claim.

>was not allowed to address the court. The case was
>before Judge Joseph Rosenweig[*sic*].

(*See generally* McAllister Aff.; Follins Aff.)

The affidavits are also silent with respect to critical details that would tend to carry exculpatory weight. For example, the affiants do not explain their relationship to petitioner. *See Read v. Thompson*, No. 13CV3661KMKPED, 2016 WL 165715, at *10 (S.D.N.Y. Jan. 13, 2016) (collecting cases assigning little or no weight to alibi testimony where witness or affiant was a family member or friend of defendant); *cf.* *McCray v. Bennet*, No. 02-CV-839, 2005 WL 3182051, at *4 (S.D.N.Y. Nov. 22, 2005) (discrediting affidavit of petitioner's "good friend" where, among other things, the affiant "waited until after [the] [p]etitioner[']s conviction to come forward with his testimony"). Nor do the affidavits: identify which "friend" accompanied the affiant and petitioner to Brooklyn the night of the murder; explain why or where in Brooklyn they were driving petitioner that night; or explain how or why McAllister and Fallon were *both* driving petitioner to Brooklyn that night.

Most importantly, neither affidavit states which "night" the affiant drove petitioner to Brooklyn, and moreover, approximately what time of night the trip took place. (*See generally* McAllister Aff.; Follins Aff.) Did "that night" refer to May 5, 2000, hours before Hammonds was killed in the early

morning hours of May 6? And if so, what time of night? Or did
"that night" refer to the evening of May 6, well over twelve
hours after Hammonds was shot?  Neither affidavit says, and
thus, neither meaningfully exculpates petitioner.  In sum, aside
from the affiants' conclusory statement that petitioner could
not have killed Hammonds, no facts asserted by either affidavit
are mutually exclusive with the facts establishing petitioner's
guilt.  Even if Mr. Follins or Mr. McAllister drove petitioner
to Brooklyn on the evening of May 5 or May 6, 2000, nothing
about that fact materially diminishes, much less precludes, the
possibility that petitioner ventured into Queens past midnight
on May 6, and was in a position to kill Hammonds at point blank
range.

        Second, Mr. Hinkson's affidavit states only that he
"interviewed the three witnesses and prepared interview reports
that contained their detailed statements," and that he forwarded
copies of the reports to Mr. Brettschneider containing "the
address and telephone number of the witnesses, Brian Follins,
Donte McAllister, and Brenda Caroll."  (Hinkson Aff.)  Notably,
Mr. Hinkson did not provide any details regarding the witnesses'
statements, or the contents of their alibi accounts.  Moreover,
the witness statements themselves are conspicuously absent from
the record, and Mr. Hinkson appears not to have appended them to
his own affidavit.  In Mr. Defelice's 2003 affirmation, he

recalls Mr. Hinkson telling him that he was searching for the statements in his records.  (Defelice Aff. ¶ 4.)   Petitioner still hadn't produced these records in 2007, when he filed his § 440.10 Motion, nor has he submitted them in connection with this *habeas* proceeding.   The court can safely assume, seventeen years after Mr. Hinkson purportedly began searching for the witness statements, that the records either never existed, or are lost to time.

Third, petitioner's mother, Ms. Sonia Pinckney, states in her affidavit that she "personally requested that Mr. Brettschneider interview these [alibi] witnesses and file an alibi notice with the courts but he failed to do so." (Sonia Pinckney Aff.)  Ms. Pinckney does not say when she informed counsel about the purported alibi witnesses, or what potentially exculpatory information she conveyed to Mr. Brettschneider.  She claims that "Ms[.] Caroll informed [Ms. Pinckney] that Comfort Pinckney was with her at her residence in South Brooklyn, on the date and time of this incident." (*Id.*)  As with Mr. Fallon and Mr. McAllister's alibi statements, however, Ms. Pinckney's hearsay recollection of Ms. Caroll's alibi account is wholly lacking in exculpatory details.  And leaving aside the threadbare nature of Ms. Pinckney's account, there is no indication that petitioner has made the slightest effort to

40

track down his alibi witnesses, and urged them to come forward with their exculpatory evidence.

Fourth, Mr. Somerstein, petitioner's pre-trial counsel, stated that he "spoke to a Brenda Caroll," and she told him "that she was with the defendant at or about the time of the commission of the crime and she appeared to be an alibi witness." (Somerstein Aff.) Somerstein states that because "he did not continue with this case, [he] did not file an alibi notice but the information concerning [Brenda Caroll] was left in the file which [he] surrendered when he was [relieved]." (*Id.*) Mr. Somerstein was replaced by Mr. Wallenstein, who was subsequently replaced by Mr. Brettschneider. Mr. Wallenstein did not provide an affidavit to the court record and, therefore, it is unknown what record was provided to Mr. Brettschneider, though Ms. Pinckney asserts that she informed him of these witnesses. (Sonia Pinckney Aff.)

In his affidavit, Brettschneider insists that "[n]ever during any of my conversations with either defendant or his mother did either one of them inform me about potential alibi witnesses." (Brettschneider Aff. ¶ 4.) Further, Brettschneider states that petitioner never told him that "he was in Brooklyn on the night of the murder or that he could produce witnesses to that effect." (*Id.* ¶ 14.) The trial record does show that Brettschneider identified Brenda Caroll, Donte McAllister, and

Brian Follins as potential witnesses for trial, but not as alibi witnesses.  (Trial Tr. 76-78.)  Although it is impossible to verify whether petitioner or his mother actually informed Brettschneider that these witnesses could credibly provide alibi testimony, it bears mention that petitioner did not file his own sworn statement refuting Brettschneider's account.  In addition, neither petitioner nor Mr. Defelice filed a late notice of alibi, a reasonable action to expect if indeed there was an expectation that Mr. McAllister, Mr. Fallon, or Ms. Caroll had information to provide in support of an alibi defense.

At bottom, the court affords due deference to the state court's denial of petitioner's ineffective assistance claim, and even if no such deference were extended, petitioner fails to allege under *Strickland* that his trial counsel erred by not filing an alibi notice.  There is no credible inference that the purported alibi witnesses were in possession of any legitimately exculpatory information, that their testimony would changed the trial's outcome, or that securing their attendance at trial would have merited trial counsel's time and effort.

### 3. Failure to Explore a Valid Line of Defense

The court can readily reject petitioner's claim that Brettschneider rendered ineffective assistance of counsel for pursuing a defense of "complete innocence," rather than "presenting evidence in the nature of a wrong man defense." (§

440.10 Motion 11, 13.)  Petitioner asserted in his § 440.10

Motion that one of the prosecution's eyewitnesses, Vincent

Johnson, who observed and described the getaway car, also

initially identified a different person as Hammonds' killer.

(*Id*. 13-14.)

        Preliminarily, petitioner's contention is a

paradigmatic second-guessing of counsel's trial strategy. *See*

*Mason v. Scully*, 16 F.3d 38, 42 (2d Cir. 1994) ("Actions or

omissions by counsel that might be considered sound trial

strategy do not constitute ineffective assistance.") (internal

quotation marks omitted).  Rarely, if ever, does such a claim

pass muster under *Strickland*.  This case is no exception.  Mr.

Brettschneider states in his affidavit that he "determined that

misidentification was the best trial strategy to pursue in this

case," and that petitioner and his mother were in "full

agreement and participated in this decision." (Brettschneider

Aff. ¶¶ 10, 11.)  Neither petitioner nor his mother submitted a

sworn statement to the contrary.  And contrary to petitioner's

assertion, the record clearly shows that Brettschneider cross-

examined Johnson at trial, and successfully elicited Johnson's

testimony that he originally identified the photo of a Mark

Perry as the shooter, and not the petitioner.  (Trial Tr. 438.)

Brettschneider also challenged the line-up procedure as unduly

suggestive at the *Wade* hearing, and emphasized that the

witnesses' descriptions were limited.  (*See generally Wade* Hr'g
Tr.; Trial Tr. 695, 700).  In addition, Brettschneider
introduced videotape evidence to persuade the jury that the
witnesses could have misidentified the shooter due to the
lighting at the time of the shooting.  (Brettschneider Aff. ¶
11.)

In reading the record, the court finds Brettschneider
vigorously pursued a wrong man defense.  Petitioner's unsworn
assertions to the contrary do not warrant second-guessing this
strategy.  *See Jones v. Fischer*, No. 05 CV 24, 2006 WL 2583206
at *7 (E.D.N.Y. Sept. 6, 2006) ("Allegations with regard to pre-
trial preparation and trial advocacy that 'are vague,
conclusory, and unsupported by citation to the record, any
affidavit, or any other source . . . do not permit the [c]ourt
to conclude that the charged errors reflect performance falling
below an objective standard of reasonableness or that but for
the errors the result would have been different.'").
Accordingly, petitioner's ineffective assistance claim in this
respect fails.

4. Failure to Challenge Probable Cause for Arrest

Petitioner further alleges that Brettschneider
rendered ineffective assistance of counsel because he failed to
challenge whether probable cause existed to justify petitioner's
arrest.  (§ 440.10 Motion 14-21.)  Specifically, petitioner

44

asserts that, on May 6, 2000, the "police received an anonymous call from an unknown female," who informed the police that "she heard several people talking in the street who were discussing the shooting, mentioned an individual known as Comfort Pinckney as the shooter." (*Id.* 15-16.)

There is zero record support for petitioner's contention that the police obtained probable cause to arrest him based on a tip from an anonymous female individual. Both the petition and § 440.10 Motion are bereft of record citations substantiating this claim, and petitioner wholly ignores other, independent sources of probable cause that justified his arrest, namely, a police investigation that included multiple eyewitnesses who identified petitioner as Hammonds' shooter. (*See* Opp. 21.) The sequence of events that culminated in petitioner's arrest thoroughly refutes his ineffective assistance claim. Garfield Smith, who was working as the bouncer at Tony's bar on May 6, 2000, informed the police that the gunman had fled the scene of the shooting in a red or maroon car, and provided authorities with a partial license plate number. (Trial Tr. 496-98, 502-04.) Police eventually traced the license plate to a car registered in the name of petitioner's brother-in-law. (*Id.* 545-47.) On May 9, 2000, Desir identified petitioner in a photograph array at the 105th

45

Precinct.  Petitioner was arrested shortly thereafter, and once in custody, Desir identified him in a line-up.

The record also reflects that Brettschneider strenuously challenged the sufficiency of probable cause to arrest petitioner by arguing that the line-up was unduly suggestive.  (*Wade* Hr'g Tr. 29-37.)  It is not clear how Brettschneider can be criticized for not predicating petitioner's *Wade* argument on the anonymous call, when there is no indication anywhere in the record that such a call ever took place, much less served as the basis for petitioner's arrest. At a minimum, petitioner has failed to show that his counsel's performance fell below an objective standard of reasonableness under the first *Strickland* prong, much less under the AEDPA's doubly deferential standard.  *See Jackson v. Kirkpatrick*, No. 16-CV-3973 (JFB), 2019 WL 102098, at *8 (E.D.N.Y. Jan. 4, 2019) (denying petitioner's ineffective assistance of counsel claim because petitioner was mistaken in the basis of probable cause and counsel properly challenged the identification procedures as being unduly suggestive).  Accordingly, petitioner's ineffective assistance claim based on trial counsel's strategy of challenging the probable cause for petitioner's arrest, must be dismissed.

5. <u>Failure to Request DNA Testing</u>

i. Exhaustion

Petitioner contends that his counsel failed to request exculpatory evidence.  (Pet. 9.)  This presumably refers to the petitioner's request in his § 440.10 Motion to have a baseball cap found at the scene of Mr. Hammonds' shooting tested for exculpatory DNA evidence pursuant to CPL § 440.30(1-a), and his concomitant claim that counsel was ineffective for failing to have pursued DNA testing in furtherance of a "wrong man defense." (*See* § 440.10 Motion 23-26.)  In denying petitioner's motion, Justice McGann found that DNA testing would "not give rise to a reasonable probability that the result of defendant's trial would have been different" because there was "not testimony at the trial which links the cap either to the shooter or to anyone else at the scene." (§ 440.10 Order 5.)  On August 19, 2020, respondent informed the court that the New York Appellate Division, Second Department, had granted petitioner's request for poor person relief and the assignment of counsel in connection with his appeal of Justice McGann's order denying his request for DNA testing pursuant to CPL § 440.30(1-a).  (Feb. 19 Ltr. 1.)  Petitioner's appeal remains pending.  (Oct. 19 Ltr.)

Although petitioner's motion to test for DNA evidence is unexhausted, the court has determined that the time is now ripe to consider and resolve the merits of petitioner's

allegations.  Petitioner's § 440.10 Motion to test DNA evidence
shares a common nucleus of fact with his claim that defense
counsel's performance fell below Constitutionally acceptable
standards.  The court also finds that petitioner's ineffective
assistance claim can be discerned from petitioner's pending
appeal of Justice McGann's refusal to allow DNA testing.  To be
clear, by deliberating the merits of the ineffective assistance
claim, the court does not seek to prejudge the merits of
petitioner's pending state court appeal. The sole issue this
court considers regarding DNA testing is whether petitioner's
Sixth Amendment rights were trampled by counsel's decision not
to pursue DNA evidence relating to the baseball cap, and whether
the § 440.10 Order applied the appropriate standards in
rejecting petitioner's challenge to counsel's decision.[16]

---

[16]     Even if these claims were not distinct, the court has "discretion
to deny unexhausted claims on the merits, although it is not required to do so."
*Velazquez v. Poole*, 614 F. Supp. 2d 284, 311 (E.D.N.Y. 2011) (citing 28
U.S.C. § 2254(b)(2)). "The Second Circuit . . . concluded that a court
'should exercise discretion either to dismiss the unexhausted claims and stay
further proceedings on the remaining exhausted portion of the petition or to
dismiss the petition in its entirety.'" *Id.* (citing *Zarvela v. Artuz*, 254
F.3d 374, 380 (2d Cir. 2001) (brackets omitted).  The court is also mindful
of the Supreme Court's warning that "[s]tay and abeyance, if employed too
frequently, has the potential to undermine the[] twin purposes" of the AEDPA.
*Rhines v. Weber*, 544 U.S. 269, 277 (2005).  Where, as here, the "unexhausted
claims are plainly meritless," "the district court would abuse its discretion
if it were to grant [petitioner] a stay," even if there is good cause for
petitioner's failure to exhaust his state remedies.  *Id.*  Simply put, this
federal *habeas* case is over ten years old, and concerns a seventeen-year-old
conviction. It is ripe for disposition, and the pendency of a lone, plainly
meritless claim should pose no bar to resolution.  The court thus exercises
its discretion to review the ineffective assistance of counsel claims in
their entirety.

ii. Merits

Petitioner asserted in his § 440.10 Motion that counsel erred by not "recognizing the importance of the bloodied baseball cap recovered at the scene" and that this "piece of evidence [] was crucial to the 'wrong man' defense that should have been offered." (§ 440.10 Motion 8, 26.)  As support, petitioner cited the following police investigation notes, which appear to capture Mr. Desir's description of a hat: "Hat THG. Green turqu[oui]se shirt." (*Id.*, Ex. 8 (NYPD Investigation Notes, 3).)[17]  Indeed, police did recover a "gray baseball cap . . . with blood on it" during a review of the crime scene.  (*Id.*, Ex. 10 (NYPD Crime Scene Unit Recap Sheet).)[18]

Respectfully, the DNA evidence to which petitioner attaches such significance is little more than a red herring. Petitioner generally insists, without specifics, that if "counsel reviewed those police notes that were provided as part of the discovery materials, the import of the bloodied baseball cap would have been manifest and exculpatory." (§ 440.10 Motion 8.)  Petitioner presumably believes that if DNA testing of the hat were to reveal genetic material belonging to another individual, that evidence would have an exculpatory impact.  But

---

[17]     The NYPD Investigation Notes are available on the docket at ECF No. 71-1, ECF pp. 41-43.

[18]     The Crime Scene Unit Recap Sheet is available on the docket at ECF No. 71-1, ECF p. 45.

this presumes that Hammonds' shooter was actually wearing a
baseball cap.  Absent some evidence or testimony linking the
shooter to the cap, the composition of any DNA on the cap is
neither here nor there.

The record demonstrates that no baseball cap was
entered into evidence, nor did the prosecution rely on it in any
form.  More importantly, not one witness testified to having
seen the shooter adorn any kind of head covering on the night of
the shooting.  In fact, Desir testified at trial that the
shooter, whom he identified as petitioner, had a "low Caeser,
low, low haircut."  (Trial Tr. 302.)[19]  This observation suggests
the shooter's hairline was visible, and not concealed by a
baseball cap, as petitioner implies.  Desir's credibility was
bolstered at trial when the prosecution corroborated his
testimony that the shooter had removed a "silver watch with a
blue head" shortly before the fatal shooting.  (*See* § 440.10
Motion, Ex. 8 (NYPD Investigation Notes, 2); Trial Tr. 309,
334.)  The police recovered a watch matching Desir's description
from petitioner after he was placed in custody.  (Trial Tr.
550.)

At trial, Prague Alexander also identified petitioner
as the shooter, and Garfield Smith's testimony linked petitioner

---

[19]     During trial, Desir identified petitioner as the shooter, even though
petitioner had grown out his hair and braided it since the time of the
shooting.  (*Id.* 301-02.)

to the crime scene.  As with Desir, Alexander did not describe
petitioner as wearing a baseball cap, although he generally was
unable to describe what petitioner was wearing the night of the
shooting.  (Trial Tr. 448, 483.)  Alexander further stated that
he "wasn't too far away," when he saw petitioner fire his weapon
at close range while pointing it at Hammonds' face, whereupon
Hammonds' "body dropped." (*Id*. 460.)  Smith identified the
partial license plate of the vehicle the gunman entered and fled
in, which police linked to petitioner's brother-in-law.  (*Id*.
496-98.)  Collectively, the two eyewitness accounts identifying
petitioner as the shooter, along with other reliable
corroboration, dispel any claim that petitioner may have been
prejudiced by counsel's failure to pursue DNA testing of a
baseball cap with no clear connection to the crime itself.  *See
Jackson v. Conway*, 763 F.3d 115, 154 (2d Cir. 2014) (holding
that counsel's alleged failure to introduce DNA reports was not
ineffective assistance because, "while they may have been
helpful to the defense they 'did not have [any] exceptional
value' in light of the victim's testimony . . . ."); *see also
Yount v. Maddock*, 44 F. App'x 279, 279 (9th Cir. 2002) ("In
light of the strength of the evidence presented at trial and
[petitioner's] failure to show a reasonable likelihood that the
DNA tests would have yielded exculpatory evidence, he cannot

establish the requisite prejudice.") (citing *Strickland*, 466
U.S. at 694).

Critically, petitioner does not acknowledge the
significant downside risk that he would have borne had counsel
pursued DNA testing.  The reasonableness of trial counsel's
omission cannot be fairly assessed without considering the risks
of the action petitioner demands from the vantage of hindsight.
Had testing revealed that the cap contained DNA matching
petitioner's, he would have been definitively linked to the
crime scene, and his defense strategy would have been
eviscerated.  By contrast, a negative result would not have been
dispositive of petitioner's innocence, given the overwhelming
evidence against him and the prosecution's non-reliance on DNA
evidence.  *See, e.g.*, *Manino v. Artus*, No. 06-CV-3078ARRJO, 2009
WL 1117301, at *18 (E.D.N.Y. Apr. 24, 2009) ("Here, trial
counsel's decision not to test the bandana for DNA was
reasonable in light of the other evidence tending to identify
Manino as McCloskey's assailant, as the results may have further
incriminated Manino."); *Hayes v. Harry*, No. 18-CV-0199, 2018 WL
9345577, at *12 (E.D. Pa. Sept. 28, 2018), *report and
recommendation adopted*, No. 2:18-CV-00199, 2019 WL 3802022 (E.D.
Pa. Aug. 13, 2019) ("DNA testing that excluded petitioner as a
source of DNA [on hooded sweatshirt found at the crime scene]

52

would not have established petitioner's innocence in light of
other evidence and testimony against him.").

       In short, petitioner fails to show that counsel's
decision not to pursue DNA testing was unreasonable or
prejudicial under *Strickland*.  Accordingly, petitioner fails to
state a claim for ineffective assistance of counsel, both under
*Strickland* and the AEDPA's doubly deferential standard.

**III.    Ground Two: Denial of Due Process Due to Lower Court
       Finding that Trial Counsel's Affidavit Held Greater
       Probative Value Than the Certified Trial Transcript**

       Petitioner asserts the state court denied his due
process rights in his § 440.10 proceeding by improperly
assigning greater probative value to his trial counsel's
affidavit than the certified trial transcript, and denying
petitioner due process without a hearing.  (Pet. 24.)
Specifically, petitioner claims he was denied "compulsory
process to call witness[es] on his behalf," and that the state
court erred by affording greater weight to Brettschneider's
representation in his affidavit that he was never informed about
the purported alibi witnesses, than the certified trial record,
in which Mr. Brettschneider submitted the names of Brenda
Carroll, Dontay McAllister, and Brian Follins as potential
witnesses.  (*Id.*)  For the reasons below, this claim is
meritless.

**A. Petitioner's Due Process Claim is Procedurally Barred**

The "AEDPA requires that petitioners first exhaust all available remedies in state court before bringing their claims in federal court." *Vega v. Griffin*, No. 14-CV-7479-KAM-SJB, 2020 WL 2738229, at *7 (E.D.N.Y. Apr. 13, 2020) (citing 28 U.S.C. § 2254(a)). A *habeas* petitioner does not need to "cite chapter and verse," but the petitioner must "alert the state court to the claim's . . . nature." *Jackson*, 763 F.3d at 133. Therefore, "[t]he exhaustion requirement is not satisfied unless the federal claim has been presented to the state courts," requiring that the petitioner have "informed the state court of both the factual and the legal premises of the claim he asserts." *Lopez v. Graham*, No. 10-CV-0468 NGG, 2012 WL 1865502, at *1 (E.D.N.Y. May 22, 2012), *aff'd*, 519 F. App'x 52 (2d Cir. 2013) (internal quotation marks omitted) (quoting *Daye v. Att'y Gen. of State of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982)). The burden is on the petitioner "to raise these claims to the state courts 'even if the state court could have identified and addressed the federal question without its being raised.'" *Vega*, 2020 WL 2738229, at *7 (citing *Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005)).

Although a federal *habeas* court will generally abstain from reviewing unexhausted claims, "if, at the time a state prisoner applied for federal relief, the claim is unexhausted

and it is clear that the state court would hold the claim procedurally barred, the claim is deemed exhausted." *Rivera v. Artus*, No. CIV.A.CV04-5050(DGT), 2007 WL 3124558, at *4 (E.D.N.Y. Oct. 25, 2007); *see Williams v. Goord*, 277 F. Supp. 2d 309, 316 (S.D.N.Y. 2003) ("When a petitioner fails to 'fairly present' his claim to each level of the state courts to which he is entitled to seek relief and is subsequently barred from presenting the claims to the highest court of the state, the petitioner's claims are not properly exhausted for purposes of federal habeas review.") (citing *Coleman*, 501 U.S. at 731-32, 735 n. 1); *Ramirez v. Att'y Gen. of State of N.Y.*, 280 F.3d 87, 94 (2d Cir. 2001) ("Even if a federal claim has not been presented to the highest state court or preserved in lower state courts under state law, it will be deemed exhausted if it is, as a result, then procedurally barred under state law."); *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991) (same).

Respondent urges the court to dismiss petitioner's claim as unexhausted but procedurally barred.  According to respondent, petitioner "never presented his due process claim in the state court and now raises these claims for the first time in the *habeas* petition." (Opp. 39.)  Moreover, petitioner "no longer has a forum to raise his alleged due process violation." (*Id.*)  Upon a review of the record, respondent's account bears out.  Accordingly, petitioner's claim is unexhausted, but also

procedurally barred because his time to move to reargue his §
440.10 Motion has long since passed.[20]

That does not end matters, however.  State procedural
default will not foreclose *habeas* review where a petitioner can
(1) establish cause for his default and actual prejudice
resulting from the alleged violation of federal law, or (2)
demonstrate that the failure to consider the petitioner's claims
would result in a fundamental miscarriage of justice.  *See*
*Gutierrez*, 702 F.3d at 111; *Carvajal v. Artus*, 633 F.3d 95, 104
(2d Cir. 2011).  But petitioner does not remotely allude to any
cause justifying his failure to raise the instant due process
claim in state court, either in his petition or his reply.  (*See*
*generally* Pet.; Reply.)

Petitioner's default may still be excused, absent a
dual showing of cause and prejudice, if he can show that a

---

[20]      Petitioner no longer has the right to raise his due process claim
under New York law, either on direct appeal or on collateral review.  For
example, he is time-barred from making a motion for reargument to the
Appellate Division, Second Department.  N.Y. App. Div., Second Dep't, Rules
of Practice, § 1250.16(d)(1) ("A motion for reargument of or leave to appeal
to the Court of Appeals from an order of the court shall be made within 30
days after service of the order of the court with notice of entry.").
Petitioner is also precluded from raising this claim in a new § 440.10
motion.  CPL § 440.10(3)(c) ("The court may deny a motion to vacate a
judgment when . . . [u]pon a previous motion made pursuant to this section,
the defendant was in a position adequately to raise the ground or issue
underlying the present motion but did not do so.").  Finally, he is time-
barred from making a motion for reargument or reconsideration to the Court of
Appeals of its denial of his leave to appeal.  22 N.Y.C.R.R. § 500.20(d)
("Unless otherwise permitted by the assigned Judge, the reargument or
reconsideration request shall be served not later than 30 days after the date
of the certificate determining the application of which reargument or
reconsideration is sought.").  Thus, the unpresented claims are now
procedurally barred under New York law, and, therefore, deemed exhausted for
federal *habeas* purposes.  *See Ramirez*, 280 F.3d at 94; *Grey*, 933 F.2d at 120.

fundamental miscarriage of justice would result, *i.e.*, "that he is actually innocent of the crime for which he has been convicted," *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002) (citations omitted). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Id.* (quoting *Bousley*, 523 U.S. at 623) (alteration in original, internal quotation marks omitted).  As discussed above, there is overwhelming evidence placing petitioner at the scene of the crime and identifying him as the person who shot and killed Hammonds.  To the extent any purported procedural error contributed to the omission of certain alibi testimony, there is nothing in the record to suggest the witnesses possessed any material exculpatory information that would have potentially changed the outcome of petitioner's trial.  Thus, petitioner's due process claim is procedurally barred.

### B. Petitioner's Due Process Claim Lacks Merit

Petitioner's due process claim also fails on the merits.  Petitioner asserts that the state court's "denial of his claim on the merits, based on his trial attorney's affidavit, was unreasonable since the decision disregarded the trial record . . . [in light of] Pinckney's trial attorney placing the alibi witnesses' names (Dante McAllister, Brian Follins, and Br[e]nda C[a]rroll) on the record during voir dire." (Reply 6 (citing Trial Tr. 76).)  But the record makes

clear that Brettschneider announced Mr. McAllister, Mr. Follins, and Ms. Carroll only as potential defense witnesses, not potential alibi witnesses.  As discussed above, Brettschneider also specifically attested that petitioner and his mother never informed him about the potential alibi witnesses.

Moreover, petitioner's claim relating to alleged errors in a state post-conviction proceeding is not cognizable on federal *habeas* review.  *See, e.g.*, *Guzman v. Coutore*, No. 99CIV11316(RMB)(HBP), 2003 WL 165746, at *13 (S.D.N.Y. Jan. 22, 2003) ("[C]laims relat[ing] to alleged deficiencies in [the state's] post-conviction procedures, fail [ ] to present a viable habeas claim.") (citation omitted, alterations in original); *Jones v. Duncan*, 162 F. Supp. 2d 204, 219 (S.D.N.Y. 2001) (Petitioner's "assertion that the failure to hold a hearing on his CPL §§ 440.10 and 330.30 newly discovered evidence motions violated due process is not cognizable on federal habeas review."); *Diaz v. Greiner*, 110 F. Supp. 2d 225, 235 (S.D.N.Y. 2000) ("Petitioner's unsupported assertion that the trial court denied his (third) CPL § 440.10 motion without a hearing violated due process is not cognizable on federal habeas review."); *Franza v. Stinson*, 58 F. Supp. 2d 124, 152 (S.D.N.Y. 1999) (Petitioner's "vague assertion that the trial court's denial of his CPL § 440.10 motion violated due process and equal

protection is not cognizable on federal habeas review.").

Accordingly, petitioner's due process claim is dismissed.

## IV.  Ground Three: Denial of Due Process and Right to A Fair Trial Due to "Unduly Suggestive" Police Investigative Procedures

Petitioner asserts that his due process and fair trial rights were violated by the "unduly suggestive" police-conducted line-up, in which Desir identified him as the shooter.  (Pet. 27.)  The petition alleges:

> Petitioner was placed in a line up with fillers visibly older smaller and with full facial hair, where petitioner was a two hundred and twenty pound male in his early twenties.  The description of the perpetrator was a young male in his early twenties, two hundred pounds, and petitioner was the only one in the line up who fit that description.  Further, the police told the witness the shooter would be in the line up.  Therefore, petitioner stood out in the unnecessarily suggestive line up.

(*Id.*)

On March 14, 2006, the Appellate Division, Second Department denied petitioner's claim, asserted in his *pro se* supplemental brief, that the line-up conducted by police on May 9, 2000 was "unduly suggestive."  *Pinckney*, 27 A.D. 3d at 582. Petitioner sought to challenge the validity of the allegedly suggestive line-up based on statements made at trial without seeking to reopen the *Wade* hearing.  (*See Pro Se* Supp. App. Br. 1-13.)  The Appellate Division stated that "[c]ontrary to the defendant's contention in his supplemental *pro se* brief, the

lineup was not unduly suggestive, and the hearing court, therefore, properly denied that branch of the defendant's omnibus motion which was to suppress identification testimony . . . ." (*Id.*)[21]

For the reasons that follow, the court agrees with the Appellate Division and finds that petitioner partook in a Constitutionally-permissible pre-trial identification procedure.

### A. Legal Standard

"[E]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas." *Rojas v. Woods*, No. 07 CIV 6687 DAB GWG, 2008 WL 2875082, at *9 (S.D.N.Y. July 25, 2008), *report and recommendation adopted*, No. 07 CIV. 6687 (DAB), 2009 WL 4639620 (S.D.N.Y. Dec. 3, 2009) (quoting *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir. 1983)).  Rather, an erroneous ruling rises to a federal constitutional violation "only where petitioner can show the error deprived her of a fundamentally fair trial." *Id.*  Further, "[t]he Supreme Court has made clear that a federal court may not grant habeas review on the basis that a state court erred in applying state law." *Tyrell v. Lee*, No. 11CIV3348CSLMS, 2015 WL 9666334, at *6 (S.D.N.Y. Dec. 14, 2015) (citing *Estelle v. McGuire*, 502 U.S. 62 (1991)).

---

[21]    The New York Court of Appeals affirmed the Appellate Division's decision on May 9, 2006.  *See People v. Pinckney*, 6 N.Y.3d 897 (N.Y. 2006).

To prevail on a claim that an erroneous state-law evidentiary ruling deprived a petitioner of due process under the Fourteenth Amendment, a petitioner must show that "the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985). Thus, the error "must have been crucial, critical, highly significant." *Id.* (citing *Nettles v. Wainwright*, 677 F.2d 410, 414-15 (5th Cir. 1982)).

In *Simmons v. United States*, the Supreme Court held that after considering a conviction "on its own facts," courts may set the conviction aside "only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Dunlap v. Burge*, 160, 165 (2d Cir. 2009) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). The more "general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations," and as *Simmons* set forth a general rule, the state court is afforded significant discretion. *Id.* at 166 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). A line-up is "unduly suggestive as to a given defendant if he meets the description of the perpetrator previously given by the witness and the other

lineup participants obviously do not." *Raheem v. Kelly*, 257
F.3d 122, 134 (2d Cir. 2001); *see also Perry v. New Hampshire*,
132 S. Ct. 716, 724 (2012).

Even if pre-trial procedures have been unduly
suggestive, "a court may nonetheless admit in-court
identification testimony if the court determines it to be
independently reliable." *United States v. Wong*, 40 F.3d 1347,
1359 (2d Cir. 1994) (citing *Manson v. Brathwaite*, 432 U.S. 98,
114 (1977)).  "[T]he independent reliability of the witnesses'
testimony guards against a 'very substantial likelihood of
irreparable misidentification.'" *Alonge v. Chappius*, No. 12-CV-
542 (KAM), 2019 WL 1642449, at *6 (E.D.N.Y. Apr. 16, 2019)
(citing *Neil v. Biggers*, 409 U.S. 188, 198 (1972)).

### B. Physical Characteristics of the Fillers

Petitioner argues that "he was identified based on an
unduly suggestive lineup" because the fillers were "visibly
older[,] smaller and with full facial hair, where petitioner was
a two hundred and twenty pound male in his early twenties," and
he was the "only one in the line up who fit [the perpetrator's]
description." (Pet. 27.)  Petitioner characteristically does
not substantiate his claim with citation to the record or other
documentation.

"A lineup is unduly suggestive as to a given defendant
if he meets the description of the perpetrator previously given

by the witness and the other lineup participants obviously do not." *United States v. Wilson*, 493 F. Supp. 2d 469, 472 (E.D.N.Y. 2006) (quoting *Raheem*, 257 F.3d at 134).  A line-up may be unduly suggestive where the "defendant is the only participant who meets the particular description of the perpetrator given by eyewitnesses," though "federal law does not mandate 'total uniformity of appearance.'" *Alonge*, 2019 WL 1642449, at *7 (quoting *Piper v. Portuondo*, 82 F. App'x 51, 52 (2d Cir. 2003)).  "The focus of the inquiry is not whether the suspect has a distinctive feature not shared by the other participants, but whether that feature matches the description provided by the witness." *West v. Greiner*, No. 01 CV 1267(JG), 2004 WL 315247, at *15 (E.D.N.Y. Feb. 12, 2004) (where witnesses' descriptions of perpetrator did not include grey hair, the fact that petitioner was the only person in the line-up with grey hair did not render the procedure unfairly suggestive); *compare Solomon v. Smith*, 645 F.2d 1179, 1182-84 (2d Cir. 1981) (line-up suggestive where suspect was only person meeting height and weight descriptions provided by witness), with *United States v. Jacobetz*, 955 F.2d 786, 803 (2d Cir. 1992) (line-up not suggestive despite fact that suspect had smallest mustache where witness had described suspect as having no facial hair at all).

Petitioner asserts that he was the only one who fit
the description of the perpetrator as a "young male in his early
twenties, two hundred pounds." (Pet. 27.)  However, it does not
appear from the record that the description given to the police
focused on the age or weight of the perpetrator.  Brettschneider
argued at trial that "the only description [the police] were
given is the shooter had a silver watch on." (Trial Tr. 700.)
Further, Brettschneider said that the only description Desir had
given of the shooter's clothing during his testimony was that he
was wearing a "green T shirt with a pocket on the left side and
black jeans." (*Id.* 695.)  The police investigation notes
reflecting Desir's description do not refer to the perpetrator's
physical characteristics, but only what he was wearing. (§
440.10 Motion, Ex. 8 (NYPD Investigation Notes, 2-3).)  During
the line-up, petitioner wore neither a green shirt (*Wade* Hr'g
Tr. 25-26), nor his watch (Trial Tr. 180).

The crux of petitioner's argument is that the line-up
fillers were so dissimilar that petitioner stood out.  Because
the line-up photographs were not preserved for appellate review,
they are not present within the record. (*Pro Se* Supp. App. Br.
15-16.)  The court will not infer suggestiveness, however, based
on the fact that the line-up photographs have been misplaced.
*See Ranta v. Bennett*, No. 97 CV 2169, 2000 WL 1100082, at *39
(E.D.N.Y. May 23, 2000) (noting that "the mere fact that line-up

64

identification photographs were inadvertently lost after trial
does not require that a presumption of suggestiveness be
applied," and indicating that the "appropriate focus" is whether
the loss of the exhibit was a "result of bad faith") (internal
citations and quotation marks omitted), *aff'd*, 189 F. App'x 54
(2d Cir. 2006).  There is no indication that the line-up
photographs were lost due to bad faith, and it remains the
petitioner's burden "to present clear and convincing evidence
that the state court's factual determination was erroneous."
*Velazquez v. Poole*, 614 F. Supp. 2d 284, 325 n.32 (E.D.N.Y.
2007) (citation omitted).

  The transcript of petitioner's *Wade* hearing does not
clarify the extent of the weight and age disparities between
petitioner and the line-up fillers.  In his *pro se* supplemental
appellate brief, petitioner maintained that the "fillers ranged
in age from Forty-five (45) to Sixty (60) years old," "[o]ne of
the fillers even walked with a cane, also these fillers weighed
approximately one hundred and thirty (130) pounds." (*Pro Se*
Supp. App. Br. 14.)  In contrast, Sergeant Libretto testified
that some of the five men involved in the line-up appeared to be
in their twenties. (*Wade* Hr'g Tr. 31-32.)  Although Sergeant
Libretto acknowledged that Mr. Somerstein, petitioner's attorney
at the time of the line-up, objected to the fillers' weights and
ages, the specifics of the objection were not elaborated upon at

the *Wade* hearing, or elsewhere in the record.  (*See id*. 35.)
Sergeant Libretto did testify, notably, that petitioner and the
fillers were seated during the line-up.  (*Id*. 22.)  Sergeant
Libretto also noted that the police granted Somerstein's
requests to modify the line-up, including a request to change
petitioner's attire to a black shirt, and switching his position
in the line-up.[22]  (*Id*. 25-26.)

     Courts within the Second Circuit will tolerate
significant weight disparities in a police line-up, particularly
where the participants are seated, before the threshold for
suggestiveness is met.  *See, e.g.*, *Perkins v. Comm'r of Corr.
Servs.*, 218 F. App'x 24, 25 (2d Cir. 2007) (finding that
"[d]espite certain age and weight disparities, the fillers were
sufficiently similar to the defendant in appearance so that he
was not singled out for identification"); *Stallings v. Heath*,
No. 11 CIV. 4894 DLC AJP, 2012 WL 735399, at *11 (S.D.N.Y. Mar.
7, 2012), *report and recommendation adopted*, No. 11 CIV. 4894
DLC, 2012 WL 1538513 (S.D.N.Y. May 2, 2012) (where line-up
participants were seated, line-up not suggestive even though
fillers were between 20 to 123 pounds heavier than defendant);
*Velazquez*, 614 F. Supp. 2d at 328 (variations in weight
neutralized where line-up participants were seated); *Jackson v.*

---

[22]    Petitioner asserts the line-up was unduly suggestive because the
fillers had "full facial hair," (Pet. 27), but the record reflects no such
objection by his counsel.  (*See generally Wade* Hr'g Tr.)

*Ross*, No. CIV. 89-0591, 1989 WL 88008, at *2 (E.D.N.Y. July 26, 1989) (weight discrepancy largely eliminated because line-up participants were seated); *United States v. Porter*, 430 F. Supp. 208, 211 (W.D.N.Y. 1977) (line-up not invalid although defendant weighed 150 pounds and all fillers weighed over 190 pounds). Relatedly, discrepancies in age alone are not dispositive. *Alonge*, 2019 WL 1642449, at *8.  The burden is squarely on petitioner to present clear and convincing evidence that the totality of circumstances rendered a pre-trial identification procedure unduly suggestive, and made him stand out so as to suggest he was the culprit.  *See Velazquez*, 614 F. Supp. 2d at 325 & n.32; *see also Piper*, 82 F. App'x at 52 ("The critical question is whether a defendant's appearance made him 'so [stand] out' from the others in the lineup as to suggest unfairly that he 'was more likely to be the culprit.'") (quoting *Jarrett*, 802 F.2d at 41).

Petitioner falls far short of demonstrating, by clear and convincing evidence, that the line-up was unduly suggestive, and fails to substantiate his assertions that the line-up fillers were so much older, heavier, or otherwise distinct in appearance as to make petitioner stand out as the suspect.  The description of Hammonds' shooter did not include any relevant physical characteristics that would have made petitioner stand out in the line-up in violation of the Constitution.  Moreover,

petitioner did not wear his wristwatch during the line-up, a distinctive feature that might have hastened Desir's identification of the shooter.  Thus, the court defers to the state court's finding that the line-up was not unduly suggestive.  Before dismissing petitioner's claim, however, the court will delve further into the circumstances of the line-up to determine if other circumstances tainted the identification procedure.  These circumstances include comments by Sergeant Libretto and other officers in Desir's presence, as well as Desir's own reliability.

### C. Informing Witness That Shooter Was Present in Line-up

Petitioner claims that the "police told [Desir] the shooter would be in the line up." (Pet. 27.)  Generally, remarks and other actions by law enforcement personnel conducting an out-of-court identification procedure "may render an otherwise fair [identification procedure] impermissibly suggestive." *Velazquez*, 614 F. Supp. 2d at 323 (citing *United States v. Thai*, 29 F.3d at 808, 810 (2d Cir. 1994)).  Here, however, petitioner offers no specific support for his claim, and the record evinces no such improperly suggestive comments or actions in connection with the line-up by Sergeant Libretto or other officers at the 105th Precinct.

According to Desir, the identifying witness, the officers who conducted the line-up told him "that they got

68

somebody they believe was a suspect, to see if I see him in the
lineup, you know, the guy that shot Preme [*i.e.* Hammonds] that
night basically." (Trial Tr. 332.) This comment did not taint
the line-up or Desir's subsequent identification of petitioner
as the shooter. "[I]t is implicit in the display of a line-up
that a suspect is among the persons viewed, and stating this
fact to a witness is thus insufficient to create a substantial
likelihood of misidentification." *Green v. Connell*, No. 05 CV
5795 CBA, 2006 WL 3388656, at *8 (E.D.N.Y. Nov. 21, 2006)
(citation omitted); *see Hodge v. Henderson*, 761 F. Supp. 993,
1007-08 (S.D.N.Y. 1990) ("[I]t is implicit in the viewing of a
lineup that a suspect might appear . . . . Such information does
not predispose the viewer of the lineup to select any particular
person[.]"), *aff'd*, 929 F.2d 61 (2d Cir. 1991) (per curiam).
Otherwise, there is no indication of improperly suggestive
comments in the record that may have tainted the line-up.

### D. Independently Reliable Identification

Assuming, *arguendo*, the line-up procedure was tainted,
petitioner still cannot succeed on his claim because the
witness's visual identification was ultimately independently
reliable. "Even if an identification procedure is unduly
suggestive, the out-of-court identification may nonetheless be
admissible if other factors indicate that the identification is
independently reliable." *Brisco v. Ercole*, 565 F.3d 80, 89 (2d

Cir. 2009).  The Supreme Court has held that "reliability is the linchpin in determining the admissibility of identification testimony."  *Alonge*, 2019 WL 1642449, at *9 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)).

The five-factor test set forth in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972), governs whether a witness's in-court identification is reliable.  Those factors are: "(1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and confrontation."  *Brisco*, 565 F.3d at 89 (citing *Biggers*, 409 U.S. at 199-200).  "A good or poor rating with respect to any one of these factors will generally not be dispositive, and in each case, the question of independent reliability must be assessed in light of the totality of the circumstances."  *Raheem*, 257 F.3d at 135 (internal citations omitted).

Weighing the totality of the *Biggers* factors, the court finds that Desir's identification was independently reliable and thus properly admitted.  Regarding the first two factors, it is clear from Desir's trial testimony that he had ample opportunity to closely observe petitioner's face and other physical features in the period immediately preceding the

70

shooting.  Desir testified that he had observed petitioner
fighting with another individual for two to five minutes from a
few feet away.  (Trial Tr. 304.)  Shortly after, Desir found
himself arguing face-to-face with petitioner for several minutes
(*id.* 307), during which time he closely observed petitioner,
"trying to see how his face looked." (*Id.* 307-08.)  Thereafter,
Desir slowly backed away from petitioner and observed him remove
his wristwatch.  (*Id.* 309.)  Hammonds then interposed himself
between Desir and petitioner, leading to an argument between the
three men that lasted around three minutes.  (*Id.*)  Desir then
noticed petitioner "open the glove compartment [of his car], put
something in his waist, close the glove compartment, close the
door, [and] come[] back," with an object that appeared "black
with a handle" tucked near petitioner's waist.  (*Id.* 317-18.)
Desir was just feet away when petitioner, standing face-to-face
with Hammonds, pulled out a gun, which prompted Desir to flee.
(*Id.* 323-25.)  In all, Mr. Desir's testimony establishes that
the first two *Biggers* factors weigh strongly in favor of
reliability.  *See Gonzales v. Smith*, No. 09-CV-5507 CBA, 2010 WL
6540402, at *11 (E.D.N.Y. July 30, 2010), *report and
recommendation adopted sub nom. Gonzalez v. Smith*, No. 09-CV-
5507 CBA RLM, 2011 WL 1542824 (E.D.N.Y. Apr. 22, 2011) (finding
that witnesses' descriptions of the encounter "make clear that
they each had sufficient time to view the assailant" even though

71

one witness was seeking "refuge behind a parked car.") (citing *Mysholowsky v. People of State of N.Y.*, 535 F.2d 194, 198 (2d Cir. 1976)).

The third *Biggers* factor is neutral because Desir did not provide the police with a description of the shooter before the May 9, 2000 line-up.  The fourth factor favors Desir's reliability because he identified petitioner as the culprit at the line-up, and there is no indication he possessed doubts about his identification.  (Trial Tr. 333-34.)  Finally, the fifth factor also supports finding that Desir's identification was independently reliable because he identified petitioner only three days after the shooting. (*Id*. 331-34)*; see Alonge*, 2019 WL 1642449, at *9 (identification was independently reliable where "a very short time elapsed between the crimes committed against each complainant and the identification: Jean-Baptiste's identification occurred four days after the incident with her assailant, and Stuger's identification occurred only two days after the incident with her assailant.").

In sum, considering the totality of the circumstances, Desir's identification was independently reliable, and the line-up as a whole was not unduly suggestive.  Petitioner has not mustered a scintilla of evidence that would raise doubts about the Constitutional propriety of the line-up, much less clear and convincing evidence to that effect.  Therefore, petitioner's

*habeas* challenge to the pre-trial identification procedure is denied and dismissed.

## V.   Ground Four: Ineffective Assistance of Appellate Counsel

Petitioner argues that his appellate counsel, Ms. Napoli, rendered ineffective assistance on direct appeal by failing to adequately challenge the performance of petitioner's trial counsel.   (Pet. 29.)   For the reasons set forth below, this claim is denied.

### A. Petitioner's Ineffective Assistance of Appellate Counsel Claims were Adjudicated on the Merits

Under the AEDPA, "a federal court may not grant a habeas petition" on a claim that has been adjudicated on the merits by a state court "unless that adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'"   *Aparicio*, 269 F.3d at 93.   Therefore, "to invoke the deferential standards of AEDPA, the state court need only dispose of the petitioner's federal claim on substantive grounds, and reduce that disposition to judgment."   *Id*. at 93-94.

First, petitioner previously raised his ineffective assistance of appellate counsel claim in a writ of error *coram nobis*.   He has, therefore, exhausted this claim.   *See Sweet v. Bennett*, 353 F.3d 135, 141 n.7 (2d Cir. 2003) ("In New York,

*coram nobis* is the appropriate remedy for ineffective assistance
of appellate counsel."). Second, the Appellate Division's
denial of petitioner's claim was an adjudication on the merits.
The Appellate Division stated that "[t]he appellant has failed
to establish that he was denied the effective assistance of
counsel." *See Pinckney*, 67 A.D.3d 1030. As "there is nothing
in [the Appellate Division's] decision to indicate that the
claims were decided on anything but substantive grounds,"
*Aparicio*, 269 F.3d 78 at 94, the court applies AEDPA "double"
deference in reviewing petitioner's ineffective assistance of
appellate counsel claim. *Harrington*, 562 U.S. at 105 (quoting
*Knowles*, 556 U.S. at 123).

### B. Petitioner's Claim Lacks Merit

#### 1. Legal Standard

In considering an ineffective assistance of appellate
counsel claim, courts apply *Strickland's* two-prong test.
*Aparicio*, 269 F.3d at 95 ("Although it was born in the context
of ineffective assistance of counsel, *Strickland's* two-prong
test applies equally to claims of ineffective assistance of
appellate counsel on a defendant's first appeal as of right.")
(citing *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985)). It is
not sufficient for the *habeas* petitioner "to show merely that
[appellate] counsel omitted a nonfrivolous argument," as
"[c]ounsel is not obliged to advance every nonfrivolous argument

74

that could be made." *Id*. (citation omitted).  "Accordingly,
when reviewing the performance of appellate counsel, courts
should refrain from 'second-guess[ing] reasonable professional
judgment and impos[ing] on . . . counsel a duty to raise every
colorable claim on appeal." *Alston v. Phillips*, 703 F.Supp.2d
150, 185 (E.D.N.Y. 2010) (quoting *Jackson v. Leonardo*, 162 F.3d
81, 85 (2d Cir. 1998)).

 In analyzing *Strickland* through the lens of appellate
performance, petitioner can only show that appellate counsel's
performance was deficient "if petitioner shows that counsel
omitted significant and obvious issues while pursuing issues
that were clearly and significantly weaker." *Joyce v.
Martuscello*, No. 11 CIV. 5265 LBS, 2012 WL 4219615, at *7
(S.D.N.Y. Sept. 20, 2012) (brackets omitted) (quoting *Ramchair
v. Conway*, 601 F.3d 66, 73 (2d Cir. 2010)).  As to prejudice, a
petitioner must demonstrate that "there was a reasonable
probability that petitioner's appeal would have been successful
before the state's highest court." *Anderson v. Keane*, 283 F.
Supp. 2d 936, 941 (S.D.N.Y. 2003) (citing *Smith v. Robbins*, U.S.
259, 285 (2000)).

 2. Appeal of Trial Counsel's Alleged Failure to Object
   to "Surprise In-Court Identification"

 Petitioner alleges that appellate counsel erred by not
challenging trial counsel's failure to object to the trial

court's "ruling permitting prosecution witness Prague Alexander
to make a 'surprise in-court identification of appellant based
on a purported C.P.L. 710.30 confirmatory identification notice,
which confirmatory identification Alexander denied making on
cross examination." (Pet. 29.) This assertion is without
merit. CPL 710.30(1)(b) provides, in relevant part, that when
the prosecution intends to offer at a trial, "testimony
regarding an observation of the defendant either at the time or
place of the commission of the offense or upon some other
occasion relevant to the case, to be given by a witness who has
previously identified him as such, they must serve upon the
defendant a notice of such intention, specifying the evidence
intended to be offered." CPL § 710.30(1)(b). This section, is
"by its terms, limited to 'police arranged confrontations.'"
*Welch v. Artus*, No. 04-CV-205 S, 2007 WL 949652, at *29
(W.D.N.Y. Mar. 29, 2007).

At trial, Alexander testified on behalf of the
prosecution that, just before the murder, he saw petitioner
standing on the street and, assuming it was actually
petitioner's brother, approached him to say hello. (Trial Tr.
468-70.) Petitioner turned around after Alexander tapped him on
the shoulder, which allowed Alexander to recognize him. (*Id.*)
Alexander also identified petitioner at trial. (*Id.* 448.)
Immediately after the identification, petitioner's trial

76

counsel, Mr. Brettschneider, moved to preclude Alexander's
testimony, contending petitioner had never received notice that
Alexander knew defendant, or that there had been an
identification procedure.  (*Id.* 450.)   The prosecutor responded
that the State was not required to serve a CPL § 710.30(1)(b)
notice because the identification was merely confirmatory.
(*Id.*)   Moreover, the State demonstrated that it had nonetheless
provided notice ten months earlier to both the state court and
defense counsel.  (*Id.*)   Justice Rosenzweig agreed that no
notice was required for a confirmatory identification, and
denied petitioner's motion to preclude.  (*Id.*)   Brettschneider
did not move again to preclude Alexander's testimony.

   In directly appealing petitioner's conviction,
petitioner's appellate counsel, Ms. Napoli, did not assert that
the trial court erred by admitting Alexander's testimony, or
allege that trial counsel was ineffective for not moving a
second time to preclude Alexander's trial identification after
his first motion was denied.  This decision was not
unreasonable, in light of the relevant statute and case law,
which holds that the strictures of CPL § 710.30 need not be
adhered to where no pre-trial identification has taken place.
*See Welch*, 2007 WL 949652, at *29; *see, e.g.*, *People v.
Zambrano*, Indictment No. 00208-03, 2003 WL 22922437, at *8 (N.Y.
Sup. Ct. Nov. 24, 2003) ("The evidence introduced at the hearing

establishes that the police did nothing to 'arrange' identifications of any of the defendants by these witnesses. The 'point out' identifications which did occur were the spontaneous product of an accidental encounter between the witnesses and the suspects. There being no governmental action involved there exists no basis for the suppression of any of the identification testimony[.]") (citing *People v. Dixon*, 647 N.E.2d 1321 (N.Y. 1995), and *People v. Capel*, 232 A.D.2d 415 (N.Y. App. Div. 1st Dep't 1995)).

It also hard to fathom how petitioner was prejudiced by appellate counsel's decision to omit the CPL § 710.30 issue in the opening appellate brief.  After all, petitioner himself raised this very issue in his *pro se* supplemental appellate brief.  (*Pro Se* Supp. App. Br. 17.)  Petitioner asserted therein that the trial court's summary denial of defense counsel's motion to preclude an alleged confirmatory identification was erroneous as a matter of law.   The Appellate Division rejected petitioner's argument, finding "the People were not required to give prior notice of the in-court identification of the defendant by a witness who had not previously identified him out-of-court." *Pinckney*, 27 A.D. 3d at 582.  The New York Court of Appeals subsequently denied petitioner leave to appeal. *Pinckney*, 6 N.Y.3d at 897.

In conclusion, petitioner fails to demonstrate that his appellate counsel fell short of the *Strickland* standard, and likewise fails to show that the state court's decision rejecting his *coram nobis* application involved an "unreasonable application" of the *Strickland* test.  28 U.S.C. § 2254(d).

### 3. Trial Counsel's Failure to Challenge the Legal Sufficiency of Evidence Presented for Indictment

Petitioner also asserts that appellate counsel failed to raise on direct appeal trial counsel's alleged failure "to challenge the legal sufficiency of the evidence of appellant's indictment in light of Desir's trial testimony that he lied to the grand jury when he testified to actually seeing appellant shoot Hammonds when, in fact, he only heard shots after fleeing the scene."  (Pet. 29.)  This assertion cannot succeed in showing prejudice.

CPL Section 210.30(6) states that, the "validity of an order denying any motion made pursuant to this section is not reviewable upon an appeal from an ensuing judgment of conviction based upon legally sufficient trial evidence."  CPL § 210.30(6).  Because petitioner's allegation does not challenge the legal sufficiency of trial evidence for a judgment of conviction, rather, only the sufficient evidence to support a grand jury indictment, it would not have been reviewable on appeal.  *See Brown v. Filion*, No. 03CIV5391DLCGWG, 2005 WL 1388053, at *17

(S.D.N.Y. June 13, 2005), *report and recommendation adopted*, No. 03 CIV.5391 DLC, 2005 WL 2159675 (S.D.N.Y. Sept. 6, 2005) (citing *People v. Huston*, 88 N.Y.2d 400, 411 (1996)).  The Appellate Division would have been required to dismiss this claim and, therefore, no prejudice can stem from appellate counsel's decision not to engage in a futile exercise.

Further, "it is well settled that claims of deficiencies in state grand jury proceedings are not cognizable on federal habeas review."  *Louis v. Fischer*, No. 04CV2887(NGG)(KAM), 2007 WL 4198255, at *23 (E.D.N.Y. June 25, 2007) (citing *Lopez v. Riley*, 865 F.2d 30, 32 (2d Cir. 1989)). In *United States v. Mechanik*, the Supreme Court held that a "jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt."  475 U.S. 66, 106 (1986).  Therefore, "any error in the grand jury proceeding connected with the charging decision [is] harmless beyond a reasonable doubt," and appellate counsel's alleged failure to raise this claim cannot be said to have prejudiced the petitioner.  *Id*. at 70; *see also Thompson v. Kelly*, No. 97-CV-258H, 1999 WL 166820, at *2 (W.D.N.Y. Feb. 4, 1999) ("It necessarily follows as a matter of law that [petitioner] cannot establish that any errors made by his trial counsel with respect to the grand jury proceeding prejudiced

him, thereby foreclosing the possibility of a Sixth Amendment violation.") (quoting *Velez v. New York*, 941 F. Supp. 300, 316 (E.D.N.Y. 1996)).

At bottom, petitioner fails to show that his appellate counsel's performance was deficient, or that such performance prejudiced him, and provides the court with no reason to believe the state court applied *Strickland* unreasonably when it rejected his ineffective assistance claim. The court defers to the state court's finding, and dismisses petitioner's ineffective assistance of appellate counsel claim.

## VI.   Claim of Newly Discovered Evidence

Finally, the government's opposition refers to petitioner's "claim of newly discovered evidence." (Opp. 41; *see also* Reply 13-17.) In December 2001, at the *Wade* hearing, NYPD Detective Walter Panchyn testified that he had procured a photograph of the petitioner from the Nassau PD headquarters, which he used for the photo array shown to Desir. (*Wade* Hr'g Tr. 1-14.) In 2006, petitioner submitted a request to Nassau PD, pursuant to New York's Freedom of Information Law ("FOIL"), for any records relating to his "arrest photo(s) and reports pertaining to any and all charges [petitioner has] been arrested [] under or by your Police Department in Nassau County Jurisdiction." (ECF No. 71-1 (ECF p. 64), Petitioner's FOIL Request, dated July 31, 2006 ("FOIL Request").) On August 14,

2006, Nassau PD responded it was "unable to locate records pertaining to [petitioner's] request." (ECF No. 71-1 (ECF p. 65), Nassau PD FOIL Request Response, dated Aug. 14, 2006 ("FOIL Response").) Throughout 2006 and 2007, petitioner submitted further requests to Nassau PD for the same records, each time receiving the same response. Petitioner construes Nassau PD's statements as "newly discovered" evidence, and in 2007, asserted in his § 440.10 Motion that it constituted grounds to vacate his conviction. Petitioner argued then, as now, that the FOIL Response showed that Detective Panchyn's testimony about the source of the photo array photograph was fabricated. (§ 440.10 Motion 21-23; Reply 15.) In the instant proceeding, petitioner likewise states that Detective Panchyn's false testimony "seriously affected the integrity of [the] normal process of adjudication," though exactly how is not stated. (Reply 15.) Just as Justice McGann rejected this contention in petitioner's § 440.10 proceeding, this court also finds petitioner's claim without merit. (*See* § 440.10 Order 5.)

As an initial matter, "[a] claim based on newly discovered evidence has never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Dotsenko v. Joseph*, No. 18-CV-1640 (WFK), 2019 WL 4917952, at *5 (E.D.N.Y. Oct. 4, 2019) (internal quotation marks

82

and brackets omitted) (quoting *Herrera v. Collins*, 506 U.S. 390, 400 (1993)).  Even if the court were to consider the FOIL Response newly discovered evidence, a constitutional violation must have occurred to qualify for *habeas* relief.  The court detects no independent constitutional violation.

Moreover, the FOIL Response is not newly discovered evidence, as defined by the CPL.  Under CPL § 440.10(1)(g), a defendant can move to vacate a judgment based on newly discovered evidence under certain circumstances.  Newly discovered evidence must satisfy the following requirements in order to justify vacatur:

> 1. It must be such as will probably change the result if a new trial is granted; 2. It must have been discovered since the trial; 3. It must be such as could have not been discovered before the trial by the exercise of due diligence; 4. It must be material to the issue; 5. It must not be cumulative to the former issue; and 6. It must not be merely impeaching or contradicting the former evidence.

*People v. Deacon*, 946 N.Y.S. 2d 613, 617 (N.Y. App. Div. 2d Dep't 2012) (quoting *People v. Salemi*, 309 N.Y. 208, 216 (N.Y. 1955)).

The FOIL Response does not conform to the criteria for newly discovered evidence in several respects.  First, the source of petitioner's photograph for the photo array was a non-material issue at the *Wade* hearing, the subject of which was whether the pre-trial identification procedures, in which Desir

identified petitioner as the shooter, were unduly suggestive.
If, as petitioner's insists, Detective Panchyn lied about the
source of petitioner's photo, it's not clear what difference the
purported truth of the photo's source would have made to the
*Wade* hearing outcome, much less the trial itself.  As discussed
above, at length, the evidence against petitioner was
overwhelming, and included two eyewitness identifications.
Accordingly, petitioner cannot credibly claim that the first or
fourth requirements under CPL § 440.10(1)(g) are satisfied.

In addition, petitioner offers no justification for
waiting until 2006, more than three years after his trial began,
to first seek the records relating to the photograph.
Petitioner surely would have recalled at the time of the *Wade*
hearing, if not the trial, and certainly before 2006, whether he
had indeed been arrested or otherwise had an encounter with the
Nassau PD.  If, as petitioner claims, there was no reason to
believe Nassau PD would have a police file for him, this surely
dawned on him well before 2007.  CPL § 440.10(1)(g) required him
to pursue this matter diligently, but the time that elapsed
between the *Wade* hearing and petitioner's FOIL Request very much
evinces a lack of diligence.

The court therefore denies petitioner relief to the
extent he asserts a *habeas* claim based upon newly discovered
evidence.

## CONCLUSION

For the foregoing reasons, the petition for a writ of *habeas corpus* is DENIED in its entirety.  Petitioner's motion to amend is likewise DENIED as futile.  Accordingly, this case is DISMISSED with prejudice.  A certificate of appealability shall not issue because petitioner has not made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).

The clerk is respectfully directed to enter judgment in favor of respondent, close this case, and send a copy of this Memorandum and Order and the judgment to the petitioner at his last known address and note service on the docket.

**SO ORDERED.**

Dated:     October 19, 2020
           Brooklyn, New York

                                    /s/
                        _____
                        Hon. Kiyo A. Matsumoto
                        United States District Judge